**KENTUCKY BAR ASSOCIATION,**
Movant

v.

**Stanley M. CHESLEY, Respondent.**

No. 2011–SC–000382–KB.

Supreme Court of Kentucky.

March 21, 2013.

*OPINION AND ORDER*

The Board of Governors of the Kentucky Bar Association has recommended to this Court that Respondent, Stanley M. Chesley, KBA Number 11810, be permanently disbarred for committing eight counts of professional misconduct as charged in KBA File 13785. Chesley was admitted to the practice of law in Kentucky on November 29, 1978, and maintains a bar roster address of Fourth and Vine Tower, Suite 1513, Cincinnati, Ohio 45202.

The Board found that Respondent had violated the following provisions of SCR 3.130, the Kentucky Rules of Professional Conduct:

a) SCR 3.130–1.5(a)—a lawyer's fee shall be reasonable. Attorney's fee of over $20 million exceeded amount established by client contract and contract with co-counsel, and was otherwise unreasonable;

b) SCR 3.130–1.5(c)—contingent fee agreement. Attorney and co-counsel failed to provide clients with a writ-

ten statement stating the outcome of the matter and showing the remittance to the client and method of its determination;

c) SCR 3.130–1.5(e)(2)—division of fees among lawyers of different firms. Attorneys dividing fees without the consent of clients confirmed in writing;

d) SCR 3.130–5.1(c)(1)—responsibility for partners. Attorney knowingly ratified specific misconduct of other lawyers.

e) SCR 3.130–1.8(g)—conflict of interest. Attorney representing two or more clients participated in making an aggregate settlement of the claims of the clients ... without consent of clients and without disclosure of the existence and nature of all the claims ... and of the participation of each person included in the settlement;

f) SCR 3.130–3.3(a)—candor to the tribunal. Attorney knowingly made a false statement of material fact or law to a tribunal; Attorney failed to disclose a material fact to the tribunal to avoid a fraud upon the tribunal;

g) SCR 3.130–8.1(a)—disciplinary matters. Attorney made a false statement of a material fact in connection with a disciplinary matter; and

h) SCR 3.130–8.3(c) [now codified as SCR 3.130–8.4(c)]—Attorney engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation following the initial distribution of client funds and concealed unethical handling of client funds by others.

The Board recommended the permanent disbarment of Respondent and further requests an order of this Court awarding restitution to the affected former clients in the amount of $7,555,000.00. Pursuant to SCR 3.370(8), Respondent filed with this Court a notice to review the Board's recommendation. Upon review, we find that Respondent is guilty of eight of the alleged violations, specifically those charged under SCR 3.130–1:5(a), SCR 3.130–1.5(c), SCR 3.130–1.5(e), SCR 3.130–1.8(g), SCR 3.130–3.3(a), SCR 3.130–8.3(c), SCR 3.130–8.3(c) [now codified as SCR 3.130–8.4(c)], and SCR 3.130–5.1(c)(1). We permanently disbar him from the practice of law in the Commonwealth of Kentucky. We decline to order restitution, as that remedy is not appropriate in a case of permanent disbarment, and the claims are being litigated in separate, civil litigation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts and procedural history are taken from the record of the trial commissioner hearings, and report of the trial commissioner, Honorable William L. Graham, which was presented to the Board of Governors.

In March 2006, the Inquiry Commission, acting under rules established by this Court for the adjudication of attorney disciplinary actions, formally began an investigation of Respondent, Stanley Chesley, for his conduct in the settlement of the case of *Darla Guard, et al. v. A.H. Robins Company, et al,* (the *Guard* case)[1] in the Boone Circuit Court, Boone County, Kentucky, including his conduct in the disbursement of funds generated by the settlement of that case. The Inquiry Commission had already been investigating the conduct of other lawyers in connection with that case, namely William Gallion, Shirley Cunningham, Melbourne Mills, and David Helmers, an employee of the

---

1. Boone Circuit Court, Civil Action Number 98–CI–795. The case is sometimes referred to as *Jonetta Moore, et al. v. A.H. Robins Company, et al.,* or "the *Moore* case."

Gallion firm.[2] In December 2006, the Inquiry Commission issued formal charges against Respondent.

The *Guard* case began in 1998. Gallion, Cunningham, and Mills had contingent fee contracts with some 431[3] persons who claimed to have been injured by the diet drug commonly known as "fen-phen." Mills, because of his aggressive advertising, had secured the great majority of those clients and his contingent fee contracts provided for an attorney's fee of 30% of the sum recovered for the client; Cunningham's contracts provided a 33% fee, and the Gallion/Helmers contracts provided for a contingent fee of 33 1/3%. The Boone Circuit Court certified the case as a class action on behalf of the 431 individually-named Kentucky residents and others similarly situated who had been injured by fen-phen. The manufacturer of fen-phen, American Home Products, was the principal defendant in the action.

When the *Guard* case was filed, other similar claims against American Home Products were being pursued in other jurisdictions. A vast number of such claims were consolidated into a single "national" class action pending in a Pennsylvania federal district court. Respondent served as a member of the management committee in the Pennsylvania litigation and participated in the negotiations that reached a settlement of that case. As a result of his involvement in that case, Respondent became familiar with American Home's settlement policies and he became acquainted with its settlement personnel. All of the *Guard* case plaintiffs opted-out of the national settlement with the hope of achieving a more favorable settlement in the Kentucky litigation.

Independently of his involvement in the national case, Respondent initiated a fen-phen lawsuit on behalf of his own clients in the Boone Circuit Court, which he promptly attempted to have consolidated with the *Guard* case. The *Guard* case plaintiffs' counsel voiced strong objections to Respondent's effort to merge the cases. Eventually, however, they relented and accepted the consolidation. Respondent's national reputation and his experience in the national fen-phen settlement was a factor that induced them to drop their opposition to his intrusion into their case.

With the claims of their clients merged, Respondent, Gallion, Cunningham, Mills, and Richard Lawrence, an attorney from Cincinnati who also represented a few individual fen-phen claimants, entered into a collaborative agreement outlining the role each attorney was to perform in the litigation. They also agreed upon a method of dividing the attorneys' fees earned in the case. Gallion would serve as lead trial counsel in the event the case was tried, and would prepare the case accordingly. Cunningham and Mills would enroll clients and maintain client contact information. Respondent would act as "lead negotiator" in the effort to secure a settlement of the

2. All four of those attorneys have been disbarred by this Court for misconduct committed in connection with the *Guard* case. *Kentucky Bar Association v. Mills,* 318 S.W.3d 89 (Ky.2010); *Cunningham v. Kentucky Bar Association,* 266 S.W.3d 808 (Ky.2008); *Gallion v. Kentucky Bar Association,* 266 S.W.3d 802 (Ky.2008); *Kentucky Bar Association v. Helmers,* 353 S.W.3d 599 (Ky.2011). The trial judge in the case, Joseph Bamberger, was also disbarred for his related misconduct in the case. *Kentucky Bar Association v. Bamberger,* 354 S.W.3d 576 (Ky.2011).

3. There is conflicting information about the actual number of clients that directly retained one of the attorneys. The Trial Commissioner refers to 431; other parts of the record say 440. In a court hearing, the number 441 is mentioned. We will refer to 431 clients but the precise number is immaterial to the issues presented in this matter.

claims. Originally, the agreement provided that Respondent would take 27% of the total attorney's fee earned from any of the individual claims he might settle and from an aggregate settlement that resolved all of the claims.

The fee-apportionment agreement was reduced to writing and it expressly provided that "all parties to this agreement shall have the right to review all contracts between themselves and any other parties that may affect the fees earned and *all clients shall be advised of this agreement.*" (emphasis added). The agreement also stated clearly that "all parties to this agreement shall be identified as co-counsel in the class action styled *Guard v. American Home Products* in Boone Circuit Court in Kentucky." The agreement provided that it could be terminated by any of the attorneys on December 31, 2000. Respondent, Gallion, Cunningham, Mills, and Lawrence all signed the agreement. Respondent did not inform any clients of the agreement and he undertook no effort to determine whether any of his "co-counsel" informed the clients of the division of effort and fee-sharing arrangements. None of the clients were so informed. Respondent attempted to negotiate a collective settlement of all the *Guard* claims before the December 31 termination date, but he was not successful. He did, however, achieve individual settlements of a few cases. In those cases, the attorney's fees taken were based upon the specific contingency fee agreement with that client.

In late 2000, Respondent corresponded with his co-counsel about extending the arrangement. As a result, a new agreement was reached. The new agreement was similar in all material aspects to the original agreement except that it reduced

Respondent's fee for negotiating a settlement of the claims to 21% of the total attorney fees earned. The new agreement contained the same express provisions requiring that *all* clients receive notice of the fee agreement and that *all* of the attorneys be "identified as co-counsel in the class action styled *Guard v. American Home Products* in Boone Circuit Court in Kentucky."

The *Guard* case trial was scheduled to begin in the summer of 2001. A pretrial mediation conference was scheduled. Respondent suggests that his ongoing discussions with opposing counsel actually settled the case before the mediation conference, and that the mediation itself was merely for show. Regardless, a settlement agreement was announced on the second day of the mediation.

The settlement agreement provided that plaintiffs' counsel would obtain the decertification of the *Guard* case as a class action and the dismissal of all claims. American Home Products would pay an aggregate sum of $200 million to be divided among the 431 individual clients who had fee contracts with Mills, Cunningham, Gallion, and Lawrence. Those claims would be dismissed *with* prejudice. The remaining members of the class who had joined the action, approximately 143 individuals, were not included in the financial settlement. Their claims would be dismissed *without* prejudice. The agreement was reduced to writing and was signed by Gallion, Cunningham, Mills, and Lawrence.[4] Respondent claims that he did not sign the agreement because, as he contends, he did not represent any of the individual clients. In his view, he had been employed by the

4. Mills, who did not attend the mediation conference, and by his own admission was drunk during much of the relevant time period, was told by his co-counsel that the case settled for $150 million, not $200 million.

attorneys and had no professional responsibility to the individual clients.

American Home left it for the plaintiffs' attorneys to determine how much of the settlement fund to allocate to each of their clients. However, under the terms of the agreement, plaintiffs' counsel had to provide American Home with a schedule listing each of the settling clients and how much of the settlement money would be allocated to each client. A signed release from each client was also required. The agreement also provided that the settlement would not take effect unless plaintiffs' counsel obtained a specific number of signed client releases before a specified deadline. Two preconditions of the agreement required approval of the Boone Circuit Court. First, the class action could be decertified only by court order. Second, the claims of the individual *Guard* clients could not be dismissed with prejudice without court approval.

The settlement agreement also incorporated a "side letter" which outlined an agreement by which the plaintiffs' attorneys agreed to indemnify American Home up to a total of $7.5 million for any new fen-phen claims that might arise from individuals who were eligible to be members of the decertified class. In other words, $7.5 million of the aggregate settlement would have to be reserved to cover potential claims, at least until the applicable statute of limitations brought the subject to repose. Thereafter, any part of the reserve remaining would be subject to disposition by order of the court.

On May 9, 2001, Respondent, along with Gallion, Helmers, Cunningham, and David Schaefer, an attorney for American Home Products, appeared before the presiding judge, Joseph Bamberger, and tendered for his consideration the "Order Decertifying the Class and Dismissing Action" as required by the settlement. Judge Bam-

berger expressed concern about decertifying the class and dismissing the individual claims, especially when he realized that the settling clients and the members of the class had not been given notice of the settlement or of the impending dismissal of their claims. Respondent carefully explained to the judge that the settlement resolved only the claims of the client group (the 431); the claims of the members of the decertified class were dismissed without prejudice and they would have other avenues for redress, if they wanted to pursue them. Despite his misgivings, Judge Bamberger signed the "Order Decertifying the Class and Dismissing Action" which was entered into the record on May 16, 2001.

Respondent argues that the entry of that order terminated his responsibility in the case. He had negotiated the settlement pursuant to his agreement with Gallion, Cunningham, and Mills, and he had secured the entry of an order putting the settlement into effect.

None of the clients were informed of the decertification of the class action or the dismissal of their claims. At that point, none of the clients had even agreed to a settlement of the claim against American Home Products. Gallion, Cunningham, Mills, and Helmers then began the process of collecting the necessary releases before the deadline. They promptly set up a meeting with each client. At each meeting, the client was falsely informed that American Home had offered a specific amount for his or her claim, which the attorneys then encouraged the client to accept. Upon the acceptance of an "offer" and the signing of a release, each client was informed that the amount of his settlement must be kept secret and severe sanctions would follow any breach of that confidentiality. In each case, the amount of the "offer" was substantially less than the

amount listed on the schedule provided to American Home. The clients were not informed that American Home had agreed to an aggregate settlement of $200 million. The clients were shown none of the actual settlement documents, and they were not informed that the "offer" was coming from their own attorneys, not American Home.

While we do not agree with Respondent's position that his responsibility to the clients ended with the entry of the settlement order, we note at this point that he did not participate in the process of contacting clients to secure the releases. He did not meet directly with any of the clients to effectuate the settlement and it is not shown that he had specific knowledge of the deception practiced upon each client to secure the signed release.

When the releases, sufficient in number to trigger the release of settlement money, were obtained, Respondent advised Helmers on the most effective way to get the releases to American Home and secure its payment of the first installment of settlement money.[5] Upon receipt of the releases, American Home made an initial payment of $150 million to a client trust account in Cunningham's name. Shortly thereafter, on June 19, 2001, Respondent received a check from that trust account in the amount of $12,372,534.37. He received additional checks on July 5, 2001 and August 14, 2001, which corresponded with the dates on which American Home paid additional installments on the $200 million settlement. On November 5, 2001, American Home paid the final installment on the settlement, bringing the total amount paid to $200,450,000.00. Respondent had been paid $ 16,497,121.87, and he would soon receive more. The payout to the clients totaled only $46 million.

In early 2002, questions about the *Guard* case settlement began to surface. The fee distribution had attracted the attention of Michael Baker, a law partner of Gallion, and of David Stuart, a law partner of Mills. Neither Baker nor Stuart had been actively involved in the fen-phen case, but each one became suspicious about the way the law firm income generated by that case was being handled in his respective law firm. Each of them alerted the Kentucky Bar Association of the potential misconduct in the handling the settlement proceeds, and each filed suit against his respective partner for an accounting of law firm funds.

On January 30, 2002, the Office of Bar Counsel served notice that it was requesting subpoenas for Gallion, Mills, Cunningham, and Bank One relating to the matter. At the same time, Stuart's lawsuit led to Mills' discovery that the settlement amount was *not* the $150 million as he had been told, but was instead $200 million. On February 6, 2002, Mills angrily confronted Gallion about the deception and demanded that more money be distributed to the clients. That evening, or shortly thereafter, Gallion, Cunningham, Respondent, and Mark Modlin, a professional "jury consultant" and friend of the judge, arranged for an off-the-record meeting with Judge Bamberger.

At the meeting with Judge Bamberger, Respondent used his expertise in major class action lawsuits and mass tort settlements to persuade Judge Bamberger that a charitable organization should be established, using the *cy pres* doctrine, to administer the residual funds that might remain after all known claims against the settlement money were paid.[6] Respondent

---

**5.** American Home would pay out the settlement money, as releases were obtained, in a

series of five installments between June 2002 and November 2002.

**6.** This was the genesis of The Kentucky Fund

also persuaded the judge that he should award attorney's fees in the decertified and dismissed class action equal to 49% of the gross settlement, using the *"Grinnell"* factors [7] for awarding attorneys' fees in a successful class action. No consideration was given to the fact that each of the settling clients had a contingency fee agreement setting the allowable fee at 30%, 33%, or 33 1/3% of the amounts recovered.

Judge Bamberger approved the 49% attorney fee and authorized the use of a charitable trust for any excess funds. He also agreed to counsel's suggestion that 50% of the then-remaining undistributed settlement money be paid to the clients on a *pro rata* basis, and that 50% be retained by the attorneys for "indemnification or contingent liabilities." The judge was not informed what dollar amounts were represented by those percentages. The written order agreed upon at that meeting was signed a few days later, but it was not entered in the case record until June 6, 2002, at which time Judge Bamberger also ordered that the record of the case be sealed. It is worth noting that the written order does not reveal the attorney fee percentage allowed by the judge, nor does it disclose any absolute dollar amounts. By its omission of the specific attorney fee percentages, and the absolute dollar amounts, the written order preserves the secret of the fees claimed by the attorneys. Judge Bamberger restricted the clerk's certificate of service on that order to only Mills, Gallion, Cunningham, Helmers, and Respondent. From that point forward, all subsequent orders were sent to only those

individuals. Respondent received the order following its June 6, 2002 entry, and other orders that followed, but denies that he read any of them.

Judge Bamberger's February order in effect approved retroactively, or ratified, the disbursement of millions of dollars in attorneys' fees that had already been taken by the attorneys. There is no doubt that the purpose of the February meeting with the judge, when several investigations were beginning to gather steam, was to cover the fee distribution with a thin veil of legitimacy, and to create a legitimate-looking repository in the form of a charitable trust in which to place the undistributed money.

On February 11, 2002, the Inquiry Commission of the Kentucky Bar Association issued the requested subpoenas for bank records and other documents relating to the disbursement of the *Guard* case settlement money. That same afternoon, five wire transfers totaling some $59 million were made by Gallion and Cunningham from several personal accounts to an out-of-state bank account owned jointly by Gallion, Cunningham, and Mills.

After the successful meeting with Judge Bamberger on or about February 6, Respondent and Gallion contacted Helmers [8] to enlist his help in making the second round of disbursements to the clients that had been approved by the judge. Respondent's office provided Helmers with a document to present to each client for his or her signature. In the spring of 2002, with the documents signed, the *Guard* clients

---

for Healthy Living, a "charitable organization" used to harbor millions of dollars of the settlement money that was not distributed to the clients.

7. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 475 (2d Cir.1974), *abrogated by Goldber-*

*ger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000).

8. In the fall of 2001, Helmers was paid $3 million for his work in the case. He left Gallion's firm to start his own law firm.

received a second distribution of settlement money.

The attorneys also received an additional distribution. On April 1, 2002, Respondent received a check for $4 million, drawn on the same out-of-state bank account of Gallion, Cunningham, and Mills, to which the remaining settlement money had been moved. Respondent testified that he had no expectation of receiving an additional $4 million fee. He testified that he did not know why the check was issued or how the amount was calculated. He made no inquiry to determine the source of the payment or the reason for the payment, or the manner in which the payment was calculated. His firm simply deposited the check, and asked no questions.

That final distribution of attorneys' fees brought Respondent's total to more than $20 million, which he argues is a reasonable fee for a case of such magnitude. The total attorney's fee payable, based upon the contingent fee contracts in effect, using for illustrative purposes the contingent fee of 33 1/3%, or one-third,[9] and the $200,450,000.00 settlement, was $66,816,667.00. Respondents 21% share of that fee would equal $14,031,500.00.

Stuart, in his continuing effort to discover the extent of Mills' wrongful diversion of law firm funds, sought and obtained a commission from the Fayette Circuit Court authorizing the out-of-state deposition of Respondent, an Ohio resident. Before the deposition was taken, however, Stuart and Mills were ordered to attempt to settle their dispute by mediation. Respondent sent word through a Mills-employee attending the mediation conference that, if the settlement talks stalled, he would be willing to contribute money to get the case resolved. Initially, the mediation was unsuccessful because Stuart would not accept the highest amount Mills would offer. Respondent, who was not a party to the Stuart–Mills lawsuit, then agreed to sweeten the settlement pot by the sum of $500,000.00 to get the case settled and avoid his pending deposition. With that inducement, Stuart settled. Later, Gallion and Cunningham reimbursed Respondent $250,000.00, as their contribution to the Stuart–Mills settlement.

As the Inquiry Commission's investigation proceeded, Mills hired attorney William E. Johnson to represent him. Gallion and Cunningham hired Whitney Wallingford for the same purpose. Respondent, who at the time was not subject to a Kentucky bar disciplinary inquiry, attended a meeting with Mills, Gallion, and Cunningham, and their respective attorneys. At the meeting, Respondent urged all of the attorneys then subject to the KBA investigation to agree upon representation by the same counsel. As a result, Wallingford agreed to withdraw as counsel for Gallion and Cunningham. Before he did so, he submitted a set of documents in response to the Inquiry Commission subpoenas. The response included a client payment spreadsheet that grossly overstated the amounts of money that had been paid to the clients. Before filing the response and the spreadsheet, Wallingford asked Respondent to review the response and provide input. Respondent did so and voiced no disapproval. Respondent claims he had no way to know that the spreadsheet was inaccurate.

Respondent helped Judge Bamberger prepare for his 2005 appearance before the Kentucky Judicial Conduct Commission that was examining the judge's misconduct

---

9. We decline to calculate the effective cumulative percentage derived from slight variations in rates charged by the three attorneys: Mills at 30%, Cunningham at 33%, and Gallion 33 1/3%.

in the *Guard* case, including his involvement in the creations of the Kentucky Fund for Healthy Living, and his salary for serving as a member of its governing board. Respondent also appeared at the Judicial Conduct Commission meeting and spoke in support of the judge.

In 2005, problems for the *Guard* counsel developed on yet another front when several of the *Guard* case clients filed suit against Respondent, Gallion, Cunningham, Mills, and the Kentucky Fund for Healthy Living alleging misconduct and misappropriation of the settlement funds. The case, styled *Abbott, et. al. v. Chesley, et. al.*, (the "*Abbott* case"), is currently pending review before this Court. Respondent initially admitted to being part of the *Guard* case class counsel in initial pleadings, but in subsequent pleadings denied he acted in that capacity.

In preparing a defense for the *Abbott* case, Respondent hired Kenneth Feinberg, a nationally-recognized specialist in handling large aggregate case and class action settlements. At Respondent's behest, and based largely upon information provided by Gallion, Feinberg prepared an affidavit supporting the actions of the *Guard* case counsel in the disbursement of the *Guard* case money. In this disciplinary proceeding, however, and after learning more of the details, Feinberg disavowed the opinion he expressed in the affidavit and withdrew his approval.

After the formal KBA investigation of Respondent began in 2006, Respondent asked Jack Vardaman, the attorney for American Home Products who had negotiated the *Guard* case settlement with Respondent, to write a letter based upon Respondent's notes stating that the *Guard* case had been "settled as a class action" and that "decertification was not relevant to the collateral issues of attorneys' fees or administration of the settlement proceeds and process." Vardaman refused to do so because the statements suggested in Respondent's notes were false.

On December 4, 2006, the Inquiry Commission issued its Complaint of Misconduct against Respondent alleging violations of SCR 3.130–1.5(a); SCR 3.130–1.5(c); SCR 3.130–1.5(e); SCR 3.130–1.7; SCR 3.130–1.8(g); SCR 3.130–3.3(a); SCR 3.130–8.1(a); SCR 3.130–8.3(c). On May 26, 2009, a charge alleging a violation of SCR 3.130–5.1(c)(1) was added. After an extensive hearing including the testimony of some forty-three witnesses and the review of dozens of exhibits, the Trial Commissioner, Judge William Graham, issued a report finding that Respondent had violated SCR 3.130–1.5(a); SCR 3.130–1.5(c); SCR 3.130–1.5(e); SCR 3.130–1.7; SCR 3.130–1.8(g); SCR 3.130–3.3(a); SCR 3.130–8.1(a); SCR 3.130–8.3(c); and SCR 3.130–5.1(c)(1).

In light of the number and severity of the violations, the Trial Commissioner recommended Respondent be permanently disbarred from the practice of law in Kentucky. In addition, the Trial Commissioner recommended that Respondent pay $7,555,000.00 in restitution to the *Guard* case clients. The Trial Commissioner calculated that amount based on the attorney fees Respondent actually received minus the amount he was contractually allowed to receive.

The matter was presented to Board of Governors at a hearing, with oral arguments, on June 14, 2011. By a vote of eighteen to zero the Board adopted the Trial Commissioner's report and his recommendations. Respondent filed a notice of review with this Court.

## II. CHARGES AGAINST RESPONDENT

### A. SCR 3.130–1.5(a)

SCR 3.130–1.5(a) states in pertinent part:

> [a]lawyer's fee shall be reasonable. Some factors to be considered in determining the reasonableness of a fee include the following: (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) The fee customarily charged in the locality for similar legal services; (4) The amount involved and the results obtained; (5) The time limitations imposed by the circumstances; (6) The nature and length of the professional relationship with the client; (7) The experience, reputation and ability of the lawyer or lawyers performing the services; (8) Whether the fee is fixed or contingent.

■ The Respondent violated SCR 3.130–1.5(a) because the fee he accepted, over $20 million, was unreasonable under the circumstances of this case, and the factors cited in the rule above. Respondent argues that his fee was' reasonable because his personal take from the case was merely 10% of the total amount recovered. He presents with his argument examples of other class actions where greater percentages were approved. He cites, among others, the expert opinion given by Professor Geoffrey C. Hazard:

> When you are talking about this kind of money involved in the settlement lawyer fees in the order of 18, up to 24, 25 percent are within what courts have approved in class actions.

Professor Hazard is referring to the total attorney's fee to be allocated for the case. Here, Respondent's request to Judge Bamberger for a total fee of 49% well exceeds the normal limit suggested by Professor Hazard. Respondent argues that the reasonableness of his personal fee must be judged independently of the total amount taken by all of the attorneys, lest we convict him of guilt by association. However, we disagree. The lawyers agreed among themselves to share the work, and to share the fee. Respondent cannot disavow the excessiveness of the 49% fee ($99,220,500.00) that he requested simply because he did not personally receive all of it.

We also conclude that, given the factors cited in the rule, Respondent's $20,497,121.87 share of the fee was unreasonable, especially in light of his professed ignorance and lack of responsibility for any aspect of the litigation except showing up at the mediation and going through the motions of announcing the agreement. The factors listed in the rule above do not weigh in Respondent's favor. He has shown nothing to demonstrate that he expended a great deal of time and labor on the case. The issues of liability were not particularly difficult or novel, and even if they were, Respondent did not do the heavy-lifting on that aspect of the case. Gallion and Helmers did most of that. We do not see that Respondent forfeited other profitable employment because of his involvement in the *Guard* case. In our view, $20 million does indeed exceed "the fee customarily charged in the locality for similar legal services." The only "time limitation" was to complete his negotiation before the trial a few months away. His "professional relationship" with the clients was by his own admission extremely limited. The only factors that weigh favorably toward a large fee are "skill requisite to perform the legal service properly" and the "experience, reputation and ability of the lawyer."

The more critical factor here, however, is the existence of the contingent fee

agreement, the eighth factor listed in SCR 3.130–1.5(a). Respondent argues that his right to a reasonable fee for settling the case was not subject to the contingency fee contracts of his co-counsel because he was not party to those contracts and because the case was settled as a class action. He reminds us that attorney fees payable for the successful prosecution of a class action lawsuit are determined by the trial court, and that his fee was consistent with what was allowed by the trial court in this case. Aside from the fact that the trial judge was disbarred for his collusion with the plaintiffs' attorneys, we reject Respondent's argument that the contingent fee contracts were immaterial to the determination of whether his fee was reasonable.

Respondent cannot claim that the reasonableness of his fee should be based upon class action standards when he himself negotiated the agreement that required the decertification of the class action and the dismissal without any compensation of all pending claims, except those with fee contracts. The fact is that Respondent did not obtain the settlement of a class action; he secured the dismissal of the class action and the settlement of the some 431 individual claims that were subject to contingent fee contracts.

When Respondent sought the judge's approval for an attorney's fee, the class action was long-since dismissed. All of the members of the plaintiff class, except the 431 that had contingent fee contracts with Respondent's co-counsel, were cut loose and left to fend for themselves.

As for the 431 with contracts, none of the claimants had notice that his claim was settled and his case was dismissed. None of them had forfeited his rights under the contingent fee agreement. Each client

was entitled to the full measure of compensation allocated to him, less the contingent fee he had agreed to pay.

Respondent argues that he had no duty to the individual clients, because he was hired by none of them and had no knowledge of their fee agreements with Mills, Gallion, and Cunningham. We do not accept that ignorance is an excuse, nor do we find it credible that Respondent was unaware of the fee arrangement. When he entered into his agreement with the other attorneys, Respondent signed on as co-counsel with Mills, Cunningham, and Gallion, and he was one of the lawyers "representing the plaintiffs in the litigation pending or anticipated against [American Home Products] . . . .", as stated in the fee-division agreement. The plaintiffs in the case were his clients, and he assumed the same ethical responsibilities that he would have with any other clients. He had the duty to know his fee responsibilities to them. He had in the fall of 2000 successfully settled some of the individual cases and taken a fee based upon the contingency fee agreement.

By his own testimony, he received the first installments of $16 million in fees without any idea of the authority under which those payments had been made. If he was ignorant of the means by which his fee was being paid, he had a duty to the clients to find out. His later effort to obtain the court's retroactive approval of his fees demonstrates his knowledge that the earlier payments were improperly disbursed to him. The fee for Respondent's work on behalf of the *Guard* clients was governed by fee contracts, and the attorneys' agreement. At most he was entitled to 21% of one-third [10] of the $200,450,000.00 recovered, or $14,031,500.00.

---

**10.** See footnote 9.

■ An attorney's fee in a contingency fee case that so grossly exceeds the fee provided for in the fee agreement is unreasonable per se. Respondent's fee was subject to the limitations of the contingent fee agreements so we conclude that he violated SCR 3.130–1.5(a). Moreover, even without the fee contracts with the clients, as shown above, the 49% fee was unreasonable and Respondent's $20 million share of it taken without notice to the client was unreasonable, and constitutes a violation of SCR 3.130–1.5(a).

**B. SCR 3.130–1.5(c).**

■ SCR 3.130–1.5(c) states in pertinent part:

[a] fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. Such a fee must meet the requirements of Rule 1.5(a). A contingent fee agreement shall be in writing and should state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon recovery of any amount in a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and showing the remittance to the client and the method of its determination.

It was established in the preceding section the contingent fee agreements governed the fees properly payable to the *Guard* case attorneys. It necessarily follows from that ruling that SCR 3.130–1.5(c) is applicable. The $200 million settlement fund was justified by the cumulative total of individual settlements prepared by the *Guard* counsel and submitted to American Home Products. The cumulative fee of 49% taken collectively by the attorneys obviously exceeded the amount payable under the contingent fee contracts.

The evidence established that none of the clients were provided with an honest "written statement stating the outcome of the matter and showing the remittance to the client and the method of its determination." Instead, the clients were given a falsified statement showing, not the true amount submitted to American Home for the settlement of that individual claim, but a reduced amount, purportedly reduced by the contingent fee stated in the contract.

Respondent argues that he had absolutely no responsibility to the individual case clients because he was only hired by the *Guard* counsel to negotiate the settlement. He contends he had no contractual obligation to the members of the class and that he reasonably relied upon his co-counsel to comply with this Rule.

However, Respondent was a signatory to a fee splitting agreement, which stated that *all* clients were to receive notice of the fee splitting agreement and that *all* of the attorneys are to be "identified as co-counsel in the class action styled *Guard v. American Home Products* in Boone Circuit Court in Kentucky." The plain language of the agreement rebuts Respondent's argument that he assumed no responsibility to inform the clients he had undertaken to represent. We note that he does not rely upon express representation of his co-counsel that they had undertaken to comply with SCR 3.130–1.5(c). Each attorney had an independent duty to see that the clients received the required notice. It is not enough to assume without inquiring that someone else did it. Moreover, had Respondent chosen

to exercise his responsibility and determine if the clients were being properly notified, he may have been able to prevent the violations that were later uncovered by Mills' and Gallion's law partners. We agree with the Trial Commissioner and Board of Governors that Respondent violated SCR 3.130–1.5(c).

### C. SCR 3.130–1.5(e)

■ SCR 3.130–1.5(e) provides in pertinent part:

[a] division of a fee between lawyers who are not in the same firm may be made only if: (1)(a) the division is in proportion to the services performed by each lawyer or, (b) By written agreement with the client, each lawyer assumes joint responsibility for the representation; and (2) The client is advised of and does not object to the participation of all lawyers involved; and (3) The total fee is reasonable.

SCR 3.130–1.5(e)(2) clearly states that the clients must be advised of the fee splitting agreement and given the opportunity to object to the participation of any attorney. Respondent and the other lawyers joining the fee splitting agreement failed to comply. No client was given notice of the agreement, and no client was informed of Respondent's participation as co-counsel and none were given an opportunity to object. That failure casts doubt upon the validity of the agreement from its inception. Respondent's failure to comply includes the facts that he failed to ascertain whether any of his co-counsel had provided the required notice to clients.

Accordingly, we conclude that Respondent violated SCR 3.130–1.5(e).

### D. SCR 3.130–1.8(g)

■ SCR 3.130–1.8(g) provides in pertinent part:

[a] lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client consents after consultation, including disclosure of the existence and nature of all the claims ... and of the participation of each person in the settlement.

The evidence established that none of the clients included in the *Guard* case settlement were consulted about the aggregate settlement reached with American Home before, during, or after the mediation, and none were notified or consulted before the cases were dismissed by the Boone Circuit Court. No notice of the decertification of the class action and the dismissal of the lawsuit was given to the class and its potential members. Even though Respondent did not sign the final settlement document with American Home, and thus was not expressly identified as a "settling attorney," he was co-counsel for the plaintiffs and shared the responsibility of assuring that the rule was followed.

We agree that Respondent is guilty of violating SCR 3.130–1.8(g). Respondent's argument that he was hired solely to procure a negotiated settlement of the case, and that his responsibility extended no further is simply unavailing. The lawyers were free to divide among themselves the work required to successfully prosecute the claims of their clients, but they may not delegate their ethical responsibilities to another.

When Respondent signed on as co-counsel, he undertook the ethical responsibilities attendant thereto. He was *not*, as he suggests, brought into the case for the purpose of negotiating a settlement, although because that is his forte, he may have taken on that role. We have not forgotten that he was the lawyer for the plaintiffs in a separate case, and that upon

his request over the objection of the original *Guard* attorneys, his case was consolidated with the *Guard* case. We do not accept his assertion that he did not represent the *Guard* case clients. He had the same responsibility to the clients as his co-counsel to comply with SCR 3.130–1.8(g). The failure of compliance with the rule was his failure, as well as theirs.

Thus, we agree that Respondent violated SCR 3.130–1.8(g).

### E. SCR 3.130–3.3(a)

■ SCR 3.130–3.3(a) provides in pertinent part:

[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) Fail to disclose a material fact to the tribunal when disclosure is necessary to avoid a fraud being perpetrated upon the tribunal . . .

The charge for Respondent's violation of this rule is based upon his appearances before Judge Bamberger in the Boone Circuit Court.

First, when Respondent argued to the court that the *Grinnell* factors should be used to justify an attorneys' fee of 49%, Respondent never disclosed the existence of the contingent fee contracts that limited the total attorney fees to only 33 1/3%, or less (30%). The Trial Commissioner found that Respondent was aware of the contractual fee agreements with the *Guard* class of the total settlement and thus purposefully withheld that important information.

We understand Respondent's legal position that such contracts are not controlling when a case is settled as a class action. But we find it difficult to believe that Respondent was unaware that the clients he was representing had contingent fee contracts. When he first undertook the effort to negotiate a "global" settlement, he successfully resolved a few of the cases individually and took the contingent fee

payable in them. He may have believed when the class action was decertified that the fee agreements were not controlling, but he could not have believed they did not exist.

As we said above in connection with the reasonableness of the attorney's fee, when Respondent began receiving large fee payments without an accounting to explain them, he had a duty to the clients to determine how the fee was being calculated. Had he exercised that duty to the client, he would have learned of the fee agreements. His argument to the judge for an attorney's fee of 49%, without referencing the contingent fee contracts, deprived the court of information material to the issue before the court. That constitutes a violation of the rule.

Second, the Trial Commissioner found that Respondent deceived Judge Bamberger about the use of the *cy pres* doctrine to create the Kentucky Fund for Healthy Living. The Trial Commissioner found that Respondent *knew* the *cy pres* doctrine could not be applied to the aggregate settlement reached in the *Guard* action. Upon review of the matter, however, we conclude that Respondent's advocacy on that point falls into the realm of opinion, and it is far from certain that the *cy pres* doctrine had no place here, especially with the $7.5 million indemnity provision required by the contract.

Finally, the Trial Commissioner found Respondent violated Rule 3.3(a) by "misleading" Judge Bamberger with the argument that decertifying the class and dismissing the case without notifying the *Guard* class members was appropriate. The substantive question in this proceeding is not whether such notice was, or was not, necessary; and we decline to resolve that issue. The question is whether the attorney breached an ethical obligation by

advocating a position. In his report, the Trial Commissioner acknowledged some legal disagreement on whether notice is required before decertification. We have not established this rule to punish lawyers for advocating unsound or unconventional legal positions. Its purpose is to deter dishonesty before the courts. We may doubt Respondent's motives for securing the order that allowed for the creation of the charitable trust, but we do not find from the evidence before us that his argument to the court, in that respect, was dishonest or misleading.

We find Respondent guilty of violating SCR 3.130–3.3(a) for the reason set forth above.

### F. SCR 3.130–8.1(a)

■ SCR 3.130–8.1(a) provides in pertinent part:

> ... a lawyer ... in connection with a disciplinary matter, shall not: knowingly make a false statement of material fact.

The Trial Commissioner found that Respondent violated this rule by providing incomplete, misleading, and false answers to the interrogatories made by the Inquiry Commission. In particular, the Trial Commissioner found Respondent guilty because he denied having communicated with Judge Bamberger regarding the establishment of the charitable or non-profit entity to disburse residual funds from the *Guard* case. We agree.

The Trial Commissioner also found that Respondent provided false information to the Inquiry Commission by denying knowledge about the second distribution to the *Guard* clients prior to his receipt of additional attorney fees, and by denying he met with his co-counsel and Judge Bamberger to discuss the distribution. From our review of the evidence, we conclude that Respondent was not truthful in that regard.

Respondent is therefore guilty of violating SCR 3.130–8.1(a).

### G. SCR 3.130–8.3(c), now codified as SCR 3.130–8.4(c)

■ SCR 3.130–8.4(c)[11] states that a lawyer may not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Trial Commissioner found Respondent guilty of violating this rule because Respondent "must have been fully aware of the fraud perpetrated by his accepting fees far in excess of what he was entitled to under his contractual agreement," that Respondent knew that the *Guard* class members did not receive an accurate accounting of the settlement proceeds, and that because of this knowledge Respondent "acted with dishonesty, deceit, and misrepresentation in assisting his co-counsel in their efforts to conceal what had transpired."

Respondent complains that this charge lacks specificity. Based upon our review of the record, we agree with the Trial Commissioner's assessment. The vast amount of evidence compiled and presented in this matter demonstrates convincingly that Respondent knowingly participated in a scheme to skim millions of dollars in excess attorney's fees from unknowing clients. He may have kept himself at arm's length from Mills, Cunningham, and Gallion; and, he may not have known the details of the direct deception that, with Helmers' assistance, they perpetrated upon the clients: But no reasonable person familiar with the evidence could doubt that he received and retained fees that he knew were improperly taken at the client's expense. No reasonable person familiar with the evidence could doubt that he pur-

---

11. Formerly SCR 3.130–8.3(c).

posefully attempted to avoid conversation and correspondence that would expose his knowledge of the nefarious schemes of his co-counsel. We conclude that Respondent violated SCR 3.1308.4(c), formerly codified as SCR 3.130–8.3(c).

### H.   SCR 3.130–5.1(c)(1)

■   SCR 3.130–5.1(c)(1) states in pertinent part:

[a] lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct only if: The lawyer orders or, with knowledge of specific conduct, ratifies the conduct involved....

The Trial Commissioner found Respondent violated this rule by "orchestrating" the attempt to cover up the unethical conduct of Cunningham, Gallion, and Mills. To ratify another attorney's conduct a person must have actual knowledge of the conduct. However, SCR 3.130–1.0(f) states: "A person's knowledge may be inferred from circumstances." In our review of Respondent's conduct, we have looked not only at direct evidence of his knowledge of his peers' unethical conduct, but also for circumstances that indicate he had such knowledge.

We find several such circumstances, which when taken together, convincingly establish that Respondent was aware of the misconduct of Mills, Cunningham, and Gallion, and that he actively aided in its concealment to prevent or delay discovery of the excessive funds he had enjoyed.

Those circumstances include the following:

a.   He provided $250,000.00 of his own money to assure that David Stuart's suit against Mills would be settled, so that Respondent would not be deposed in that action and Stuart's effort to unravel the truth about the *Guard* case fees would be halted. Respondent was not a party to the dispute between Stuart and Mills. The evidence did not indicate he had a special relationship with either Mills or Stuart that would explain his strong concern about their disagreement, yet he met with Mills to encourage him to settle the lawsuit with Stuart. He actively resisted the effort to depose him. He kept himself apprised through one of Mills' employees of the attempt to mediate a settlement;

b.   He reviewed the deceptive documents that Gallion had given to Wallingford to submit to the KBA investigators. One of those documents was the phony list of *Guard* case clients that documents the greatly exaggerated amount of money each one received from the settlement;

c.   Although he claimed his responsibility in the case was over, he attended at least two meetings before Judge Bamberger to obtain retroactive approval of attorneys' fees and to create the charitable trust that would hide a large part of the purloined cash; and,

d.   After Mills's angry demands to distribute more of the lawsuit proceeds, he recruited Helmers to meet with clients for the second round of payments, and provided him with documents for the clients to sign.

While none of these facts alone is conclusive, all of them together complete the picture of Respondent's effort to conceal or hinder the disclosure of the misdeeds of Cunningham, Mills, Gallion, and Helmers, and thereby protect the improper payments he had accepted. We conclude that Respondent violated SCR 3.130–5.1(c)(1).

### I.   SCR 3.130–1.7

Respondent was initially charged by the Inquiry Commission with violating SCR 3.130–1.7 which in pertinent part provides that "a lawyer shall not represent a client

if the representation of that client will be directly adverse to another client." The Trial Commissioner could not find a clear violation of SCR 3.130–1.7 and found Respondent not guilty of violating this rule. The Board of Governors reached the same conclusion. We regard the matter of this charge as resolved in Respondent's favor and no further action is required.

### J. Summary

In summary, based on the evidence and arguments presented to this Court, we find Respondent guilty of violating SCR 3.130–1.5(a); SCR 3.130–1.5(c); SCR 3.130–1.5(e); SCR 3.130–1.8(g); SCR 3.130–3.3(a); CR 3.130–8.1(a), SCR 3.130–8.3(c), and SCR 3.130–5.1(c)(1). We find Respondent not guilty of violating SCR 3.130–1.7. We now turn to what the appropriate punishment should be for Respondent's numerous ethical violations.

### III. DISCIPLINE

Based on Respondent's ethical violations, the Trial Commissioner and Board of Governors recommended to this Court that he be permanently disbarred from the practice of law in the Commonwealth and pay restitution in the amount of $7,500,000.00. For the reasons discussed below, we agree with the recommendation to permanently disbar Respondent, but do not order him to pay restitution.

### A. Disbarment

SCR 3.380 provides the following:

Upon finding of a violation of these rules, discipline may be administered by way of a private reprimand, suspension from practice for a definite time with or without conditions as the Court may impose, or permanent disbarment.

Citing to the American Bar Association, *Standards for Imposing Lawyer Sanctions,* Rule 9.2, the Trial Commissioner found that permanent disbarment was the appropriate sanction for Respondent. *See Anderson v. KBA,* 262 S.W.3d 636 (Ky. 2008) (citing to the ABA *Standards for Imposing Lawyer Sanctions* ). ABA Standard 9.2 states:

9.2 Aggravation

9.21 Definition. Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed.

9.22 Factors which may be considered in aggravation. Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

Based on the record and all of the violations Respondent committed, we find that all of the factors apply except for (a), (e), and (f). We also find that prior case law supports the sanction of a permanent disbarment in this case. *See KBA v. Matthews,* 131 S.W.3d 744 (Ky.2004) (disbarring attorney for committing bank fraud which reflected on his honesty, trustworthiness, and fitness to practice law); *Poole v. KBA,* 128 S.W.3d 833 (Ky.2004) (disbarring attorney for committing twenty-eight

ethical violations, including the misappropriation of client funds); *KBA v. Johnson,* 660 S.W.2d 671 (Ky.1983) (disbarment appropriate sanction for the misappropriation of client funds, lending money to a client, making false representations, and possessing a forged instrument).

Respondent presents evidence that is supportive of mitigation. His most persuasive mitigation evidence is that he has never previously been disciplined by the KBA. He also presented several character witnesses who testified about his prominence in the Cincinnati legal community and his service to various charitable organizations. We are aware of Respondent's reputation and we do not doubt the veracity of the witnesses that attested to his character. While, the good reputation he has enjoyed and his generosity serves to exacerbate the tragedy of his fall, they cannot atone for the serious misconduct he has committed in connection with this matter. Therefore, we find that permanently disbarring Respondent is an appropriate penalty for his ethical violations.

### B. Payment of Restitution

The Trial Commissioner and the Board of Governors requested that we order Respondent to pay over $7 million in restitution to the *Guard* case clients. We decline to do so. We agree with Respondent's argument that our Supreme Court Rules do not allow for us to order restitution when a disciplinary action leads to a permanent disbarment. SCR 3.380 in pertinent part states: "discipline may be administered by way of a private reprimand, suspension from practice for a definite time with or without conditions as the Court may impose, *or permanent disbarment.*" The plain language of the rule indicates that while this Court may order an attorney disciplined by either a temporary suspension from the practice of law, public reprimand, or private reprimand to

comply with any conditions imposed by the Court, a permanent disbarment stands alone—separated from the language allowing us to impose conditions by the word "or."

A disbarred attorney is no longer a member of the Kentucky Bar Association and no longer subject to our direct supervision. Moreover, the affected clients have brought a civil action to recover any appropriate damages they sustained, and the determination of their remedy is more appropriately addressed in that forum.

Thus it is ORDERED that:

1) Respondent, Stanley M. Chesley, KBA Number 11810, whose bar roster address is Fourth and Vine Tower, Suite 1513, Cincinnati, Ohio 45202, is adjudged guilty of violating SCR 3.130–1.5(a); SCR 3.130–1.5(c); SCR 3.130–1.5(e); SCR 3.130–1.8(g); SCR 3.130–3.3(a); CR 3.130–8.1(a), SCR 3.130–8.3(c), and SCR 3.130–5.1(c)(1) and is hereby permanently disbarred from the practice of law in Kentucky. Respondent thusly, may never apply for reinstatement to the Bar under the current rules;

2) Respondent in accordance with SCR 3.390, shall notify all Courts in the Commonwealth of Kentucky or other tribunals in which he has matters pending, and all clients, of his inability to represent them and of the necessity and urgency of promptly retaining new counsel. The Respondent shall simultaneously provide a copy of all such letters of notification to the Office of Bar Counsel;

3) Respondent shall immediately cancel and cease any advertising activities in accordance with SCR 3.390; and

4) In accordance with SCR 3.450, Respondent has paid all costs associated with these disciplinary proceedings in the amount of $88,579.62.00.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, SCOTT and VENTERS, JJ., sitting. All concur.

ENTERED: March 21, 2013.

/s/ John D. Minton, Jr.
    Chief Justice.