SUHRHEINRICH, Circuit Judge.
For years, plaintiffs' attorney Stanley Chesley[1] appears to have been orchestrating a high-stakes shell game in an effort to escape a long-overdue multi-million dollar judgment. In the process, he has defrauded hundreds of judgment creditors, many of whom are plaintiffs here.
Three-and-a-half years ago, a Kentucky state court issued a judgment in plaintiffs' favor against Chesley for $42 million. Since then, the plaintiffs have been trying to collect on that judgment and Chesley has been successfully evading them with the help of his confidantes. In the process, five lawyers have been disbarred; two have been put in jail. Through it all, Chesley has managed to transfer most of his assets elsewhere, rendering himself judgment-proof and forcing the plaintiffs to file the fraudulent conveyance action underlying this appeal.
While that fraudulent conveyance action was pending, Chesley initiated an Ohio state probate court action. He claims the action was started for legitimate purposes-to pay off his law firm's creditors in a judicially-supervised forum. The district court disagreed. Sensing Chesley was using the probate action to continue to conceal his assets, it issued a preliminary injunction freezing those assets. In the time since the injunction was entered (and this appeal was filed), that probate action was dismissed and declared fraudulent.
The preliminary injunction-which is worded broadly enough to remain effective despite the probate action's dismissal-is the subject of our review in this interlocutory appeal. Because the injunction is still adequately supported by the record evidence and because it is still necessary, we affirm.
*606 I.
Fen-Phen Lawsuit and Settlement . The story behind this lawsuit, as chronicled by several courts,[2] begins in 1998. Three now-disbarred attorneys named Gallion, Cunningham, and Mills gathered a class of plaintiffs to sue American Home Products, manufacturer of the popular diet drug fenfluramine /phentermine (or "fen-phen"), for injuries sustained as a result of the drug's side effects. Stanley Chesley, seeing the profit-wielding potential of such a lawsuit, started his own class action against American Home Products. He then convinced the other attorneys to merge their case with his. That case moved forward under the caption of Darla Guard, et al. v. A.H. Robins Company et al. , No. 98-CI-795 (Ky. Cir. Ct. 1998) (the "Guard case").
In 2001, the parties negotiated a settlement for over $200 million and the case was dismissed, all unbeknownst to and without the approval of the class-action plaintiffs. American Home Products left it to Chesley and the other lawyers to divvy up the settlement among the class members as they saw fit. Trusting the attorneys with such a task proved to be a mistake.
So the fraud began. First, Gallion, Cunningham, and Mills met with each client separately. In each meeting, the attorneys lied and told their client that American Home Products had made the client an individualized settlement offer. Then, the attorneys offered an amount well-below what they would later report to American Home Products. For instance, the lawyers might tell a client that he had been offered $100,000 as a settlement and then report to American Home Products that the same client would be receiving $200,000-the lawyers kept the difference. Counseled exclusively by their self-serving attorneys, all of the clients assented and the settlement was finalized. In the event that a client refused, the lawyers came back a few days later with a slightly larger (but still inadequate) offer, explaining that they had successfully negotiated a higher settlement. That too was a lie.
To preserve the scheme's secrecy, the attorneys told the clients that the individualized settlements were confidential and that, should the client reveal how much he had been paid, he could be sent to jail. Thus, the lawyers guaranteed the clients' discretion and, in turn, their own protection.
The lawyers, at least for the time being, made out like bandits. American Home Products distributed a total of $200,450,000.00 in a few installments. For his part, Chesley's contingency fee arrangement entitled him to $12,767,744.45 of that settlement. Due to the fraudulent scheme, he initially received $16,497,121.87 (and would later receive more). The clients were scheduled to receive some two-thirds of the total settlement amount, roughly $134 million. In total, they received just over $74 million.
The scheme did not go unnoticed for long. The Office of Bar Counsel in Kentucky grew suspicious and began to ask questions about the settlement. Sensing that they were about to be caught, Chesley and his co-counsel sought to cover their tracks.
*607 Chesley arranged an off-the-record meeting with Kentucky state judge Bamberger, who had presided over the Guard case. In that meeting, Chesley managed to convince Judge Bamberger to retroactively award attorneys' fees amounting to 49% of the settlement, despite the fact that all four attorneys had previously negotiated lesser contingency fee arrangements with their clients. Judge Bamberger signed an order that concealed the details of this new fee arrangement and also sealed the record-thereby preserving the secrecy of this meeting and giving the lawyers the cover they sought.[3] A few months after the meeting, Chesley received a check for another $4 million from the settlement funds-bringing his plunder to nearly $20.5 million. It bears noting that even the new 49% fee arrangement under-reported the amount the lawyers received-the lawyers and their agents kept $126,255,422.87 of the settlement funds, some 63%. Bamberger , 354 S.W.3d at 578.
The fallout from this scheme has been sweeping. Five lawyers and a judge have been permanently disbarred. See Chesley , 393 S.W.3d 584 ; Bamberger , 354 S.W.3d 576 ; Ky. Bar Ass'n v. Helmers , 353 S.W.3d 599 (Ky. 2011) ; Ky. Bar Ass'n v. Mills , 318 S.W.3d 89 (Ky. 2010) ; Cunningham v. Ky. Bar Ass'n , 266 S.W.3d 808 (Ky. 2008) ; Gallion v. Ky. Bar Ass'n , 266 S.W.3d 802 (Ky. 2008). Two of Chesley's accomplices were convicted of wire fraud. See Cunningham , 679 F.3d 355. They are serving prison sentences of 240 months and 300 months, respectively. Id. at 370. Chesley avoided prosecution by testifying against his co-counsel. Id. at 384.
The $42 Million Judgment . Once the scheme became clear to the class plaintiffs, they filed another lawsuit-this time against their lawyers. In December 2004, they brought suit alleging misconduct and mismanagement of the Guard case funds. The lawsuit, styled Abbott v. Chesley , was brought in the Boone County Circuit Court in Kentucky. In March 2006, that court granted summary judgment against Chesley's accomplices, but not yet against Chesley. It then entered a $42 million judgment against those lawyers on August 1, 2007, representing the amount that the plaintiffs had been deprived of.
Meanwhile, the Kentucky Bar Association investigated Chesley for his role in the Guard case settlement. That investigation led the Kentucky Bar to issue a complaint against Chesley, which was then presented to a state Trial Commissioner. The Commissioner held that Chesley had violated eight separate rules of professional conduct[4] and recommended his permanent disbarment. In June 2011, the Board of Governors unanimously agreed, and in 2013 the Kentucky Supreme Court affirmed that decision. Chesley , 393 S.W.3d at 601-02. Chesley's time as an attorney in Kentucky had come to an end.
*608 But that wasn't the end of Chesley's problems. He was required to report his Kentucky disbarment to the Ohio Bar Association too, which would likely impose reciprocal discipline and disbar him from Ohio. See Ohio Supreme Court Rules for the Gov't of the Bar V(20). Instead, Chesley retired from practicing law in Ohio on April 16, 2013.
At the time of his disbarment and subsequent retirement, Chesley was the sole shareholder of an Ohio-based law firm, Waite, Schneider, Bayless, & Chesley, L.P.A. ("WSBC"). Trouble was, in Ohio, Chesley could no longer own and operate a law firm because he was not an admitted attorney. See Ohio Rev. Code § 1785.05. So Chesley got together with a fellow WSBC lawyer-Thomas Rehme-and executed a so-called "wind-up agreement" on April 15, 2013. Ostensibly, the agreement's purpose was to help wind up WSBC's business en route to dissolving the firm. It also served as a vessel through which Chesley could move his assets.
Through the wind-up agreement, Chesley conveyed all of his WSBC shares to Rehme for no consideration. Meanwhile, both before and after executing that agreement, Chesley funneled $59 million of his personal funds into the firm. This left Chesley with empty pockets to show his judgment creditors when they inevitably came knocking.
And knocking they came. On August 1, 2014, the Kentucky court that had entered judgment against Chesley's co-conspirators entered the same judgment against him, making him jointly and severally liable for the $42 million. That date marked an important one for the plaintiffs-Chesley had deep enough pockets (at least he did before transferring his assets) to satisfy a $42 million judgment. That meant, for the first time since the settlement was negotiated in 2001, the plaintiffs held a judgment that would allow them to collect the money they were owed from the Guard case.
Dueling State Court Proceedings . Rather than paying the plaintiffs, Chesley sued them. On January 6, 2015, Chesley filed a lawsuit against the class plaintiffs in Ohio state court to enjoin them from domesticating and executing their Kentucky judgment against him in Ohio. This kicked off a jurisdictional turf war on either side of the Ohio River.
The Ohio state court judge, Judge Ruehlman, acquiesced in this unusual request and issued an ex parte temporary restraining order forbidding the plaintiffs from domesticating their Kentucky judgment in Ohio. The plaintiffs returned to the Kentucky court with that news. On June 25, 2015, the Kentucky state court judge, Judge Schrand, responded, ordering Chesley to transfer any WSBC distributions to the plaintiffs. Two months later, Chesley returned to Judge Ruehlman and, again inexplicably, managed to receive an order directing him to disregard Judge Schrand's order. The plaintiffs once again returned to Judge Schrand, this time receiving an order that Chesley must immediately transfer his entire ownership interest in WSBC to the plaintiffs. In that order, Judge Schrand declared the wind-up agreement between Chesley and Rehme a sham transaction and ordered that it be disregarded. Yet again, Chesley refused to pay.
Judge Schrand then scheduled a show-cause hearing to find out why Chesley was ignoring his orders. He informed Chesley that he must show up for that hearing, scheduled for October 29, 2015. Chesley did not show up. So Judge Schrand issued a warrant for his arrest. Undeterred, Chesley returned to the Ohio courts, and this time sued the local Cincinnati Sheriff-seeking an injunction that would prevent *609 the Sheriff from executing the arrest warrant. That case was also assigned to Judge Ruehlman, who granted the injunction, thereby preventing Chesley's arrest.
The Federal Lawsuit . The plaintiffs were running out of options. An Ohio court blocked them each time they tried to collect on their judgment;[5] but, even if it hadn't, Chesley had already shuttled most of his funds to Rehme. Saddled with this deficit, the plaintiffs finally turned to the federal courts. On April 12, 2016, the plaintiffs sued Chesley for fraudulent conveyances in the Southern District of Ohio. Their goal was simple-to get an order recognizing Chesley's recent transfers (including the wind-up agreement) as fraudulent and to unwind those transfers. This would return the assets from Rehme to Chesley, thereby allowing the plaintiffs to finally collect their money.
The plaintiffs also asked the district court for a preliminary injunction that would freeze Chesley's assets to prevent him from moving those assets outside the court's jurisdictional reach. The district court received evidence and held full-day hearings on this issue on May 26, 2016 and again on July 26, 2016. After those hearings, but before the district court had ruled on the injunction, Chesley's assets were transferred yet again. On August 30, 2016, Rehme, who held all of WSBC's assets (and thus virtually all of Chesley's assets) by virtue of the wind-up agreement, created and incorporated a trust-"Thomas F. Rehme, Trustee, Inc." He then transferred all of WSBC's assets into that trust on September 1, 2016.[6] On September 9, 2016, the trust transferred all of the assets to a third party, Eric Goering, for the purpose of instituting an assignment for the benefit of creditors action (the "ABC action") in an Ohio state probate court. Chesley claims that action was justified-the firm needed to satisfy WSBC's creditors as part of the winding-up process. But the plaintiffs were Chesley's creditors, not WSBC's, so they likely had no place in that proceeding. On September 13, 2016, immediately after the ABC action was filed, Chesley informed the district court that Rehme no longer had the assets and thus, he argued, the federal district court could not grant relief that would affect those assets.
The district court found the timing of the ABC action suspect and entered the temporary restraining order. That order effectively enjoined the ABC action.[7] On April 21, 2017, the district court converted its order into a preliminary injunction. Rehme and WSBC pursued an interlocutory appeal, and we are now tasked with reviewing the district court's decision to grant injunctive relief.
On October 5, 2017, the Ohio Supreme Court validated the district court's suspicions. It found the ABC action to be an abuse of process and an attempt to fraudulently evade the plaintiffs' judgment.
*610 State ex rel. McGirr v. Winkler , 152 Ohio St.3d 100, 93 N.E.3d 928 (2017). Shortly thereafter, the ABC action was dismissed. Despite that dismissal, the preliminary injunction freezing Chesley's assets is still in place and subject to our review. The fraudulent conveyance action remains pending below.[8]
II.
We review a district court's decision to grant or deny a preliminary injunction for an abuse of discretion. Hunter v. Hamilton Cty. Bd. of Elections , 635 F.3d 219, 233 (6th Cir. 2011). That decision is only to be disturbed if it "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." Id. (quoting Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp. , 511 F.3d 535, 541 (6th Cir. 2007) ).
A district court considers four factors when deciding whether to grant a preliminary injunction: (1) the movant's chances of succeeding on the merits; (2) if the movant would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest. S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co. , 860 F.3d 844, 849 (6th Cir. 2017).
Considering those factors here, the district court entered a broad temporary restraining order, which it later converted into a preliminary injunction on the same basis. Among other things, the order mandated that: "The Defendants, including all agents and assignees of Defendants, shall not assign, disburse, distribute, transfer or take any action related to any asset of WSBC, including money, outside of basic office expenses." While its relief was broad, the district court's reasoning focused on the recent ABC action. That narrow focus was unsurprising given the timing of the ABC action's filing. Nonetheless, the district court still had a full record before it, developed specifically for the purpose of deciding whether to grant this relief. And we may affirm the district court's injunction for any reason supported by the record. See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth. , 163 F.3d 341, 349 n.3 (6th Cir. 1998) ; see also Beydoun v. Sessions , 871 F.3d 459, 466 (6th Cir. 2017).
Likelihood of Success on the Merits. Whether a movant is sufficiently likely to succeed on the merits is a question of law, so we review the district court's answer de novo. Hunter , 635 F.3d at 233. Here, the bulk of the plaintiffs' claims arise under Ohio's Uniform Fraudulent Transfer Act, which prohibits transfers by a debtor "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Ohio Rev. Code. § 1336.04(A)(1). The statute also codifies a non-exhaustive list of factors that can be used to prove actual intent. A few of those factors include: (1) "[w]hether the transfer ... was to an insider," (2) "[w]hether the debtor retained possession or control of the property transferred after the transfer," (3) "[w]hether before the transfer was made ..., the debtor had been sued or threatened with suit," (4) "[w]hether the transfer ... was disclosed or concealed," (5) "[w]hether the debtor removed or concealed assets," and (6) "[w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of *611 the asset transferred." Id. § 1336.04(B)(1)-(11).
Plaintiffs claim that the wind-up agreement constituted a fraudulent conveyance, as did Chesley's many other transactions during this time period. Because those conveyances check virtually all of the above-mentioned § 1336.04(B) boxes, the plaintiffs have adequately established their chances of success on their underlying claims.
First, and most simply, the district court's speculation that led to this injunction has been confirmed. It feared that the ABC action (a conveyance that was not part of the underlying complaint) was fraudulent. From that, the district court concluded that the plaintiffs were likely to succeed on the merits. According to the Ohio Supreme Court, the district court was correct. See Winkler , 93 N.E.3d at 933 ("The record also contains evidence to suggest that the ABC action, ostensibly filed to discharge WSBC's debts, was itself the product of fraud."). The Ohio Supreme Court's finding is unsurprising given that WSBC's accountant, Steve Horner, has since testified that the firm has no outstanding debt (making the need for a debt-settling action a dubious proposition). Granted, the conclusion that the ABC action was filed for evasive purposes does not have preclusive effect on the currently-pending claims. Nonetheless, it is strong evidence of Chesley's pattern of fraudulent behavior. Thus, the Ohio Supreme Court's Winkler decision tips this factor in favor of the injunction. And while this development may be sufficient for the plaintiffs to show a likelihood of success on the merits, there is plenty of other record evidence to support their claims.
To begin, the record shows that Chesley transferred his assets to an "insider" and that, in so doing, he "retained possession or control of the property." Ohio Rev. Code. § 1336.04(B)(1)-(2). Rehme, who was (and remains) purportedly at WSBC's helm under the wind-up agreement, testified that he typically signed any checks that Chesley directed him to. In the normal course of business, he said, Chesley would ask Horner to draft a check and then he would bring the check to Rehme for his signature (since Chesley was no longer in charge, he could no longer sign the checks himself). Rehme never reviewed those checks, nor did he ask any questions-he simply signed them. Under that structure, funds flowed freely between Chesley, WSBC, and other accounts attributable to Chesley. For example, in September 2015, a check was written from WSBC's account for $100,000, payable directly to Chesley. When asked about that check, Horner explained that he was out of town and did not know why the transfer was made. Checks were also frequently written to pay Chesley's personal legal bills and his household expenses (which were never actually verified). Between August 2014 and February 2016 (the period after the wind-up agreement was executed), the firm wrote Chesley $5.4 million worth of checks. Despite the wind-up agreement suggesting otherwise, Chesley was still able to direct WSBC's funds as he saw fit. Chesley's insider, Rehme, was no obstacle to that.
Moreover, Chesley actually held himself out as WSBC's controlling agent. On the firm's 2013 tax returns-the first tax year following the execution of the wind-up agreement-Chesley was listed as the firm's sole shareholder. When asked why, Rehme testified: "I think it was a mistake. A couple of times he signed-after the agreement in '13, he signed a few things by mistake, you know. He thought he was still Mr. President." Chesley also signed, as president, an employment agreement for the firm in December 2013. When *612 questioned about this, Rehme simply responded: "Yeah. He shouldn't have signed that."
The timing of the wind-up agreement-the most significant of the alleged sham conveyances-is also evidence that it was fraudulent. The agreement transferring all of Chesley's assets to Rehme was executed on April 15, 2013. This was on the heels of his disbarment less than a month earlier and the $42 million judgment against his accomplices, which was affirmed by the Kentucky Supreme Court in August 2013. See Chesley , 413 S.W.3d 589. Chesley already "had been sued," Ohio Rev. Code § 1336.04(B)(4), as he was a defendant in Abbott , and realized that judgment may soon be handed down against him. And sure enough, the judgment was levied against him the following year. The timing of Chesley's transfer to Rehme bolsters the suspicion that it was an attempt to evade the plaintiffs.
He also "concealed" the wind-up agreement from a federal court. Id. § 1336.04(B)(3). As part of a federal lawsuit seeking to collect unpaid fees from a former client, Chesley held himself out as representing WSBC. Waite, Schneider, Bayless & Chesley Co., LPA v. Davis , No. 1:11-CV-851 (S.D. Ohio Dec. 6, 2011). At the relevant hearing, Chesley managed to settle the case and collect the unpaid fees without informing the presiding judge-United States District Judge Carr-about the previously-executed wind-up agreement that forbade him from doing WSBC's business. Nor did Chesley inform him about the Kentucky court order requiring WSBC proceeds (like those subject to the litigation) to be immediately turned over to the Guard case plaintiffs. Not until one of the Guard case plaintiffs asked Judge Carr to disclose the settlement agreement and turn over the proceeds to her attorney did this information become clear. At that point, Judge Carr recognized that he had been duped. Strikingly, he explained: "at this point, I feel tricked, and complicit, albeit unwittingly so, in chicanery, duplicity, and mendacity. No judge should ever find himself in that situation." Id. at R. 271, ID# 11661; see also Waite, Schneider, Bayless & Chesley Co., LPA v. Davis , 191 F.Supp.3d 743, 746 (S.D. Ohio 2016). Because the defendant in the fee-collection lawsuit was not adversely impacted by Chesley's fraud (he had to turn the money he owed over, the only question was to whom he would pay it), Judge Carr found that the elements of fraud on the court could not be satisfied. Davis , 191 F.Supp.3d at 749. But he lamented that decision, stating: "however unwittingly, I have helped a bandit escape." Id. at 750.
Chesley also took actions before executing the wind-up agreement to "remove[ ] or conceal[ ] [his] assets." Ohio Rev. Code § 1336.04(B)(7). On this point, the big picture is instructive. In 2011, Chesley had personal assets worth $83 million. His net worth clocked in at over $29 million. At the same time, WSBC had assets over $34 million. Only one year later, Chesley's assets fell to $19.3 million, his net worth to $2 million, and the firm's assets to just over $3 million. All told, between his personal assets and the firm's assets (of which he was sole owner), Chesley managed to lose over $90 million in assets over the course of a single year.[9]
*613 Chesley and his co-defendants offer explanations for many of the allegedly fraudulent transactions. But stepping back from those individual instances paints a stark picture. In the mid-2000s, after helping to steal millions of dollars from the Guard case plaintiffs, Chesley felt the walls closing in on him. In 2005, his ex-clients sued him. In 2006, a Kentucky court found his accomplices liable. In 2007, the same court entered a $42 million judgment against them. All the while, the Kentucky Bar was investigating him. Shortly after, Chesley began to move the majority of his assets around. This evidence suggests that Chesley has been carefully keeping his money just out of the plaintiffs' reach, in the event that he was also found liable for the $42 million he had stolen.
In the end, record evidence, coupled with the Ohio Supreme Court's dismissal of the ABC action as an abuse of process, demonstrate the plaintiffs' likelihood of success. There is strong evidence that the primary transaction the plaintiffs challenge-the wind-up agreement between Chesley and Rehme-was fraudulent. A Kentucky state court has already held as much. See Mildred Abbott, et al. v. Chesley , No. 05-CI-436 (Ky. Cir. Ct. Sept. 25, 2015). "As long as there is some likelihood of success on the merits, [the four preliminary injunction] factors are to be balanced, rather than tallied." Hall v. Edgewood Partners Ins. Ctr., Inc. , 878 F.3d 524, 527 (6th Cir. 2017) (citation omitted). Thus, this factor alone may be sufficient for us to affirm. In any event, the other three factors weigh in the same direction.
Irreparable Harm. The " 'concealment and dissipation of assets' likely obtained through fraud constitutes irreparable harm for the purposes of issuing a preliminary injunction." Huntington Nat'l Bank v. Guishard, Wilburn & Shorts, LLC , No. 2:12-CV-1035, 2012 WL 5902916, at *9 (S.D. Ohio Nov. 26, 2012) (quoting NCR Corp. v. Feltz , 983 F.2d 1068 (6th Cir. 1993) (per curiam) (unpublished table case) ).
The recently-dismissed ABC action presented an obvious threat of dissipating Chesley's assets. It amounted to a judicially-sanctioned tool that Chesley could use to ship off all of his assets held in WSBC. With that action's dismissal, the most immediate threat has dissolved. However, an entirely new threat has emerged. Without the pending ABC action, Chesley's assets-whether they are held by Goering or Rehme[10] -are free to move. In that sense, the risk that Chesley will continue to hide his assets away is even greater now that the ABC action has been dismissed.
For that reason, and based on much of the evidence already discussed, it is clear that the plaintiffs still face a substantial chance of irreparable harm absent this preliminary injunction. Chesley's actions up to this point have been part of the shell *614 game. The ABC action was just another move in that game. The plaintiffs certainly have reason to believe that he will pick up where he left off were we to lift this injunction. Thus this factor also weighs heavily in favor of affirming the injunction. See, e.g. , Williamson v. Recovery Ltd. P'ship , 731 F.3d 608, 628 (6th Cir. 2013) (affirming an asset-freezing injunction because the defendant had "engaged in a number of ... questionable financial transactions" suggesting a threat of asset dissipation).
Harm to Third Parties. Chesley argues that the preliminary injunction harms WSBC's other creditors-for example, the IRS. It is true that WSBC's legitimate creditors would have been able to collect any funds they were owed through the ABC action and that staying that action would have required them to wait. That WSBC's creditors would have to wait for the outcome in an already-pending lawsuit is not a harm sufficient to outweigh the alternative-hundreds of plaintiffs losing their ability to collect on a long-ago issued judgment due to Chesley's fraud. But, in any event, this purported harm is no longer relevant because the ABC action has since been dismissed. Whereas once, as Chesley would argue, there was a line of WSBC's creditors that the plaintiffs were trying to jump to the front of, that line has since been dispersed. This factor likewise supports the injunctive relief granted below.
Public Interest. The district court held that freezing Chesley's assets served the public interest because "hundreds of judgment creditors will likely otherwise lose their ability to recover anything while the creditors of WSBC are satisfied [through the ABC action]." That conclusion was not an abuse of discretion in light of Chesley's past behavior and the concerns over the legitimacy of the ABC action. And, despite the ABC action's dismissal, that conclusion remains as relevant (if not more so) today. For the same reasons discussed within the context of irreparable harm, Chesley has offered no reason to trust that he will discontinue his years-long scheme to avoid the $42 million judgment. The central focus of that scheme has been to ship all of his money away to places safe from the plaintiffs' reach but still within his control. If we were to lift the injunction, he would be free to continue doing that, which raises the same concerns about his judgment creditors' ability to recover what they are owed. Accordingly, this factor also weighs in favor of affirming the injunction.
Moreover, there are institutional interests at stake. The litigation stemming from the Guard case settlement has been lumbering its way through federal and state courts for two decades. In its wake, officers of the court have been disbarred and imprisoned; Kentucky and Ohio state courts have been pitted against one another; and Chesley has forced the federal courts to use judicial resources to try to stop it all. There is a fundamental public interest in ending such abuse of the judicial system, in conserving judicial resources, and in preventing further confusion and disruption in this litigation. See Flowserve Corp. v. Burns Int'l Servs. Corp. , 423 F.Supp.2d 433, 440 (D. Del. 2006). This injunction promotes those ends.
III.
The preliminary injunction serves an important purpose-"to allow a victory by [the plaintiffs] to be meaningful." AIG Aviation, Inc. v. Boorom Aircraft, Inc. , 142 F.3d 431, 1998 WL 69013, at *3 (6th Cir. 1998) (unpublished table case). Balancing the four preliminary injunction factors, it is clear that the district court did not abuse its discretion in entering this relief *615 to serve that purpose. Even with the ABC action's dismissal, this relief is necessary today. Chesley and his co-defendants have proven apt at moving money around to evade the plaintiffs, and freezing his assets affords both the district court and the plaintiffs the time they need to resolve this case.
For these reasons, we AFFIRM the district court's entry of a preliminary injunction.

Chesley is a party to the lawsuit below, though not to this appeal. Because the appeal addresses an injunction to freeze assets once owned by Chesley but since transferred, he is not directly implicated. Nonetheless, he has instigated virtually every aspect of this litigation and thus, he stands at the center of this story.

The background facts to this story have been well-documented. See, e.g. , United States v. Cunningham , 679 F.3d 355 (6th Cir. 2012) ; Chesley v. Abbott , 503 S.W.3d 148 (Ky. 2016) ; Abbott v. Chesley , 413 S.W.3d 589 (Ky. 2013) ; Ky. Bar Ass'n v. Chesley , 393 S.W.3d 584 (Ky. 2013) ; Chesley v. Abbott , 524 S.W.3d 471 (Ky. App. 2017) ; State ex rel. McGirr v. Winkler , 152 Ohio St.3d 100, 93 N.E.3d 928 (2017) ; State ex rel. Ford v. Ruehlman , 149 Ohio St.3d 34, 73 N.E.3d 396 (2016).

Judge Bamberger got something out of the meeting too. As part of the settlement, the lawyers and Judge Bamberger agreed to set up a charitable organization-dubbed the "Kentucky Fund for Healthy Living"-which would be used to help distribute residual funds from the settlement. They put $20 million into that fund and later appointed Judge Bamberger as a paid director of it. He was paid a monthly salary of $5,350.00 and made a sum total of $48,150.00. Judge Bamberger has since been permanently disbarred. Ky. Bar Ass'n v. Bamberger , 354 S.W.3d 576, 579-80 (Ky. 2011).

These included: charging unreasonable fees; failing to document his contingency fee arrangement in writing; improperly dividing legal fees with attorneys from different firms; ratifying the misconduct of his co-counsel; representing clients with conflicting interests; making false statements to courts; making false statements in disciplinary proceedings; and general deceit in the distribution of client funds. Chesley , 393 S.W.3d at 585.

Those orders have since been dismissed by virtue of a writ of prohibition issued by the Ohio Supreme Court. See Ruehlman , 73 N.E.3d 396. They were dismissed after this lawsuit had already been filed and after Chesley had transferred his assets to Rehme, however. Therefore, even though the plaintiffs could presumably try to domesticate and execute their Kentucky judgment in Ohio, this case still serves the important role of unwinding Chesley's transactions so that there will be assets for the plaintiffs to collect.

Chesley contends the transfer from Rehme to his trust was "solely for purposes of causing [WSBC] to be taxed as a C corporation rather than as an S corporation."

This raised an issue under the Anti-Injunction Act which, with the ABC action's subsequent dismissal, has fallen away.

In light of the ABC action and its fallout, the plaintiffs currently seek to amend their complaint to add Eric Goering and Rehme's trust as defendants.

Other transactions raise red flags because they seem to lack economic substance. See Ohio Rev. Code § 1336.04(B)(7)-(8). For example, in 2011, WSBC sold a lot of thirty-three cars insured for over $5 million (which it had received from Chesley) to Chesley's wife, a federal district court judge, for $543,000. In 2014, WSBC bought the cars back for the same price. Chesley called this an informal quasi-collateralized loan-the firm received a half-million-dollar cash injection from Chesley's wife and the cars served as collateral. Another example involves an entity known as "Cory Kumler." Chesley wrote the entity a check for over $1 million in 2014. As it turned out, "Cory Kumler" was owned and operated by Chesley's wife. Yet another example: Chesley transferred his ownership interest in a car dealership to his wife in 2011 for no consideration. These transactions are curious, as there appears to have been no exchange of economic benefit. But because the record is not fully developed on these individual instances, we do not base our decision on them.

This is a live issue before the district court. The plaintiffs argue that Goering still has the WSBC assets and thus needs to be added as a defendant. Chesley argues that the ABC action's dismissal automatically unwound that transfer and, as such, the assets have reverted back to the trust. Goering has moved to intervene, contending that he still has the assets.