RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

FETCH! PET CARE, INC.,

        *Plaintiff-Appellant*,

    *v.*

ATOMIC PAWZ INC., et al.,

        *Defendants-Appellees*.

No. 25-1638

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:25-cv-11568—Robert Jerome White, District Judge.

Argued:  January 29, 2026

Decided and Filed:  March 20, 2026

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:**  Christopher C. Conner, SAXTON & STUMP, Harrisburg, Pennsylvania, for Appellant.  Bryan W. Dillon, LUTHER LANARD PC, Newport Beach, California, for Appellees.  **ON BRIEF:**  Christopher C. Conner, SAXTON & STUMP, Harrisburg, Pennsylvania, Louis G. Fiorilla, SAXTON & STUMP, Lancaster, Pennsylvania, for Appellant. Bryan W. Dillon, LUTHER LANARD PC, Newport Beach, California, Benjamin Low, TAFT STETTINIUS & HOLLISTER LLP, Southfield, Michigan, for Appellees.

─────────────

## OPINION

─────────────

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiff-Appellant Fetch! Pet Care, Inc. ("Fetch!"), a nationwide franchisor of pet-care services, alleges that several of its franchisees

orchestrated a coordinated effort to exit their franchise agreements due to their discontent with paying royalties.  In Fetch!'s view, these franchisees breached their agreements when they attempted to abscond and steal Fetch!'s branding, clients, intellectual property, and trade secrets with the intent to operate their own competing businesses.  On the other hand, the franchisees claim that nearly all of those operating under Fetch!'s "2.0" model have failed, as evidenced by their high attrition rate due to the model's exorbitant royalty fees, Fetch!'s failure to deliver the results it advertised, and Fetch!'s deficient but expensive corporate support.  And the few "1.0" model franchisees in this action claim they did not intend to leave but were forced to after being unexpectedly shut out of Fetch!'s system, leaving them unable to service their clients.  Their only option for survival, they say, was to open their own businesses.

In response, Fetch! promptly filed a complaint along with a motion for a temporary restraining order ("TRO") and preliminary injunction against thirty-one former franchisees.  Fetch! urged the district court to enjoin them from launching or continuing to operate their competing businesses, misappropriating its trade secrets, infringing its trademarks, and conspiring to interfere with its business relationships.  After additional briefing and a two-day evidentiary hearing, the district court denied in part and granted in part Fetch!'s motion for injunctive relief.  Specifically, the court reiterated what its TRO had ordered: that defendants-appellees stop using Fetch!'s trademarks and cease further communication with any existing Fetch! franchisee.

Ultimately, the district court determined that although the case presented a close call in several respects, Fetch! failed to carry its burden of showing that these circumstances clearly demanded a preliminary injunction.  In fact, the court noted that granting an injunction in full could fatally compromise the parties' ongoing arbitration.  The court further concluded that there was sufficient evidence that Fetch exhibited "unclean hands" in the way it sold its franchises.  Because we review the district court's application of the unclean hands doctrine for abuse of discretion and sufficient evidence in the record supports the court's conclusion, we affirm.

# I.

## A. Background

In March 2020, Phoenix Brands acquired Fetch!, led by CEO and chairman Gregory Longe.  Fetch! is in the business of granting franchises to qualified individuals and entities to operate pet-care services nationwide, and defendants-appellees[1] are some of its former franchisees that joined Fetch! at different times.  Fetch!'s franchise agreements are typically for ten-year terms and require franchisees to pay "fees and royalties in exchange for access to and use of Fetch!'s proprietary procedures, methodologies, standards, and protected marks and branding."  DE 16, Am. Compl., PageID 779.

Until 2018, Fetch! allowed its franchisees to join under a single-fee model known as "1.0," which had been in place for decades.  Under this model, franchisees were required to pay revenue-based royalties and to care for their clients without receiving any corporate support for sales, scheduling, or marketing.  The "1.0" franchisees were thus responsible for covering these expenses themselves.  In 2018, Fetch! introduced a newer model known as "2.0," which charged higher fees but included a sales and marketing call center ("SMC").  According to Longe, "2.0" was formed to "improve the success of the new franchisee[s]" by "tak[ing] the front end of the business to some degree off" their shoulders.  DE 42, Prelim. Inj. Evidentiary Hr'g, PageID 6862. Alongside "2.0," Fetch! offers a premium "Managed-Services" model, in which it is more closely involved in its franchisees' operations and offers a dedicated "support developmental manager at the home office to assist in running the day-to-day operations of the business." *Id.* at 6973.  Fetch! sold this type of franchise as an "investor model" enabling the franchisee to be "more hands off." *Id.*

To Longe, the "material difference" among Fetch!'s franchise models came down to "how the phone [was] answered, how the clients [were] taken care of and how they [were]

---

[1]The district court mistakenly stated that this case involved thirty-six individual or entity defendants.  DE 38, Prelim. Inj. Order, PageID 6786.  It involves thirty-one.  Of these, seventeen executed their franchise agreements pursuant to Michigan law and the rest did so pursuant to Ohio law.  Moreover, only three franchisees (TMB Pet Care, LLC; Under a Woof, LLC; and Worry-Free Pet Services, Inc.) are legacy "1.0" franchisees that signed agreements in 2017 and whose owners testified at the hearing on Fetch!'s motion for a preliminary injunction.

scheduled," but Longe nonetheless claimed that the "expenses [were] very similar."[2]  *Id.* at 6846–48.  Longe also asserted that Fetch! had "superior support packages, programs, superior intellectual property, [and] superior systems."  *Id.* at 6869.  Moreover, Longe stated that the "typical" franchisee got its business "up and running," generating consistent profits in just "a couple of years."  *Id.* at 6888.  In fact, during the evidentiary hearing, Longe said he believed the defendants were profitable.

Defendants-Appellees could not disagree more.  Indeed, many feel that Fetch! deceived them.  Several claim to have been unaware of the existence of different franchise models at the time they joined Fetch! and found SMC's support to be deficient and inconsistent.  Unsurprisingly, many regret having purchased a franchise.  Some were openly critical of SMC and, through at least one feedback survey, communicated to Fetch! that SMC needed to improve its response time, customer service, problem-solving, professionalism, and availability, among other issues.  Defendants-Appellees continually heard of franchisees selling their locations back to Fetch! for "pennies on the dollar."  DE 44, Prelim. Inj. Evidentiary Hr'g, PageID 7152.  This information quickly spread, and with the help of their Regional Manager, franchisees Steven and Melinda Gladin compiled a list of failed Fetch! locations.  These failed franchisees, who had operated under either a "2.0" or "Managed-Services" model (based on their buy-in time), had "lost so much money [that] they just had to hand locations back and . . . were forced to sign legal releases."  *Id.* at 7150.  This list included 125 locations and, according to a notation therein, about half had "[f]ailed in 2024."  DE 29-21, List of Failed Fetch! Locations, PageID 2795.

In spring 2024, a franchisee separately sent out a message on Fetch!'s e-mail platform asking others to add their contact information to a spreadsheet "because he was struggling to find profit and wanted to talk to other owners to get some ideas around what . . . he could do differently."  DE 44, Prelim. Inj. Evidentiary Hr'g, PageID 7157–58.  But Fetch!, citing privacy concerns, "quickly tried to shut that down."  *Id.* at 7158.  Pushing back, "1.0" franchisee Tamara Bean (TMB Pet Care, LLC) responded that if franchisees wanted to share their information, they should be able to do so.  By the time thirty to thirty-five owners from approximately fifty

---

[2]This assertion was contradicted by one of the franchisees, who clarified that although the "managed services" model had the same fee structure as "2.0," it came with an additional 5% fee for the extra services.

locations had added their personal information to the spreadsheet, these franchisees informed Fetch!'s leadership of the existence of this communications outlet. And this is how Bean started a private forum for franchisees to communicate "outside the purview of Fetch!." DE 16, Am. Compl., PageID 787.

In June 2024, IAFF[3] was formed. In its introduction letter to Fetch!, IAFF sought "to alleviate any concerns that the formation of this Association [was] adversarial in nature" and indicated that, "[o]n the contrary, it [was] intended to be a positive development for the brand and a means to foster beneficial cooperation between the Fetch! franchisees and their franchisor." DE 35-29, Establishment of IAFF, PageID 6667. Nevertheless, the letter emphasized that the association "ha[d] concerns based on past reactions to the formation of a franchisee association" and wanted "to make it clear that interference with the association w[ould] not be tolerated." *Id.* at 6667–68. Shortly after IAFF was established, its members instructed Fetch! that "[u]nder the advice of . . . legal counsel, all communications [should] be conducted in writing." DE 35-42, E-mail to Fetch!, PageID 6693. Fetch! asserts that this evinced defendants-appellees' unwillingness to communicate and respond to inquiries in good faith, all of which "constituted a material breach of their franchise agreements," citing section XIV(B)(1) in Michigan's and Ohio's agreements. DE 16, Am. Compl., PageID 787.

Around July 2024, various franchisees ceased paying royalties and, when this failed to prompt Fetch! to release them from their contractual obligations, they "began sending rescission notices . . . *en masse*." *Id.* at 788 (emphasis in original). By the end of September 2024, Fetch! had received a total of thirty-three rescission notices from franchisees—all IAFF members. And by October, IAFF members sought rescission of their franchise agreements through an arbitration lodged against Fetch!. The arbitration claimants and Fetch! agreed to stay arbitration proceedings to explore mediation; yet after several months, "multiple mediation attempts failed." *Id.* at 789.

---

[3]Some of the briefing also refers to this group as the International Association of Fetch Pet Care Franchises ("IAFPC"). Because the official letter announcing its creation refers to the association by "IAFF," we will refer to it as such.

In March 2025, The Pet Care Club, Inc. was incorporated in Delaware. During Fetch!'s evidentiary hearing, it was established that IAFF's counsel, Bryan Dillon, formed this entity as a "backup plan" for IAFF members' operations. DE 44, Prelim. Inj. Evidentiary Hr'g, PageID 7205. And although franchisees claim that they "were not preparing to pull the plug first," they increasingly became "concerned that Fetch! might unilaterally cut [them] off from the system" and that "it would have been irresponsible for [them] not to have a backup plan in place." DE 9-2, Bean Declaration ISO Defs.' Opp. to Pl.'s Mot. for TRO, PageID 497. Some franchisees believe that their involvement or membership in IAFF made them targets for termination.

The following month, IAFF sent a letter, approved by its counsel, to its members. The letter stated: "If we are forced to leave the Fetch system, please see below . . . a letter you can send to clients and a possible transition timeline." DE 34-2, Client Transition Letter & Timeline, PageID 6101. The sample transition letter included language informing clients that, "[a]fter careful consideration, and unfortunately months of failed negotiations," the franchisee had decided to part ways with Fetch! and included details on next steps. *Id.* at 6101–03. To Fetch!, this letter embodied franchisees' "roadmap for exiting the system and stealing proprietary information and clients from [it]." DE 16, Am. Compl., PageID 790.

Beginning in May 2025, Fetch! started seeing "the writing on the wall when [franchisees] started extracting their customer base" and downloading client lists, customer information, and schedules from its system. DE 42, Prelim. Inj. Evidentiary Hr'g, PageID 6924. After consulting with a law firm, Fetch! shut the franchisees out of its software on May 16, 2025. Franchisees were thereafter immediately shut out of Fetch!'s system without notice.

## B. Procedural History

On May 28, 2025, Fetch! filed an initial three-count complaint against defendants, asserting claims for breach of contract, federal trademark infringement, and misappropriation of trade secrets. Concurrently, Fetch! sought a TRO and preliminary injunction to enjoin defendants from operating competing businesses and using its trademarks.

On June 6, 2025, following a hearing on Fetch!'s motion, the district court granted in part and denied in part its motion for a TRO and issued a scheduling order on Fetch!'s request for a

preliminary injunction.  Specifically, the court ordered that defendants cease using Fetch!'s federally registered trademarks in website communications, business directories, and promotional materials.  The court, however, stated that this did not "include customer reviews on websites such as Yelp or Google that mention Fetch!" and advised defendants that they "may not link to such reviews for use on their own websites if the reviews mention Fetch!."  DE 12, Order Granting & Denying in Part Mot. for TRO & Prelim. Inj., PageID 686.  The court further ordered that defendants be enjoined from "communicating—directly or through third parties—with any existing Fetch! Pet Care, Inc. franchisee, about any issue or subject pertinent to the pending litigation."  *Id.*  The court denied Fetch!'s motion in all other respects.  Thus, defendants could continue to operate their competing businesses under these restrictions.

On June 19, 2025, Fetch! filed an Amended Complaint adding a fourth cause of action against all defendants for civil conspiracy to commit tortious interference with business relations.  After additional briefing, the district court held an additional two-day evidentiary hearing on Fetch!'s motion for a preliminary injunction and subsequently took the motion under advisement.  On July 11, 2025, the court granted Fetch!'s motion for a preliminary injunction in part and denied it in part.[4]  Fetch! timely appealed the district court's order, which is now before us.

Moreover, on July 25, 2025, defendants separately filed a Motion to Compel Arbitration & Stay Proceedings.  The district court ordered that all proceedings be stayed pending completion of arbitration except for the instant appeal and that the parties not seek modification of the preliminary injunction through arbitration "in a manner that would impact or influence"

---

[4]The district court found that Fetch! had "established a likelihood of success on the merits of its claim for misappropriation of trade secrets" because it was "undisputed that once the legacy Defendants were cut off from the Fetch! system, they used the client information already downloaded from Fetch! in order to continue serving clients under their new, competing businesses."  DE 38, Prelim. Inj. Order, PageID 6804–05.  Similarly, the court found that Fetch! was likely to prevail on its federal trademark infringement claim on the merits because Fetch! "ha[d] a registered trademark for the Fetch! name . . . [which] appears in numerous reviews on the legacy Defendants' respective Google pages for the new businesses."  *Id.* at 6805–06.  The court reasoned that because there was "no current dispute concerning the limited relief granted following the TRO hearing to prohibit all use of Fetch! marks, . . . this prohibition [was] continued, and Plaintiff's motion [was] granted as it relates to this [injunctive] relief."  *Id.* at 6806 n.8 (citation modified).  Since Fetch! does not raise either of these trade-related counts on appeal, we do not address the merits underlying them.

the appeal.  DE 45, Stipulated Order for Stay Proceedings & Referral to Arbitration, PageID 7356.

## II.

For starters, a "preliminary injunction is *preliminary*."  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025) (emphasis in original).  "Its purpose is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).  In other words, a preliminary injunction "simply puts the case in a holding pattern and 'balance[s] the equities as the litigation moves forward.'"  *EOG Res., Inc.*, 134 F.4th at 883 (alteration in original) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam)).  And because "a preliminary injunction is an extraordinary equitable remedy that is never awarded as of right," *id.* at 874 (citation modified), it "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it," *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

"We review a district court's denial of a request for a preliminary injunction for abuse of discretion."  *Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 370 (6th Cir. 2025).  Thus, a district court's decision is "only to be disturbed if it 'relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.'"  *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018) (quoting *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)).  "'A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotation omitted)).  Absent a clear error of fact or an erroneous legal conclusion, "the district court's weighing and balancing of the equities is overruled only in the *rarest* of cases."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (quoting *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992) (emphasis added) (internal quotation omitted)).  And importantly, we may "affirm the district court's denial of injunctive

relief 'for any reason supported by the record.'" *Int'l Union of Painters*, 148 F.4th at 371 (citation modified).

### III.

#### A.  Unclean Hands

We ordinarily review a district court's application of the unclean hands doctrine for abuse of discretion. *Performance Unlimited, Inc. v. Questar Publishers Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995).  "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Id.* (quotation omitted).  This doctrine "requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint," and is thus "not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Id.* (quotation omitted). Furthermore, unclean hands cannot be lightly inferred and "must be established by clear, unequivocal and convincing evidence." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 784 (6th Cir. 2003) (per curiam) (quoting *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir. 1977)).  In short, the unclean hands doctrine "is based on the principle that 'since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff.'" *J-Rich Clinic, Inc. v. Cosmedic Concepts, Inc.*, 98 F. App'x 444, 447 (6th Cir. 2004) (quotation omitted).

Fetch! argues that the franchisees' unclean hands defense turns on their "individual reliance on the underlying [Franchise Disclosure Documents]" and that they have "failed to present individualized evidence of reasonable reliance on a putative misrepresentation, which is required under the State Franchise Statutes." CA6, Appellant Br., at 40.  We note, however, that a "hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  And since a preliminary injunction "is customarily granted on the basis of procedures that are less formal and evidence that is less

complete than in a trial on the merits," *EOG Res., Inc.*, 134 F.4th at 884 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), under our deferential standard of review, we will not disturb the district court's application of the unclean hands doctrine.  Accordingly, any individual defense should be explored at arbitration.

      i.      "2.0" & Managed-Services Franchisees

The district court concluded that Fetch!'s "general conduct in advertising and selling 2.0 franchises evidence[d] bad faith sufficient to deny injunctive relief with respect to the 2.0 Defendants (including the managed-services Defendants)."[5]  DE 38, Prelim. Inj. Order, PageID 6795.  Specifically, the court found that "evidence as a whole circumstantially support[ed] that Plaintiff aggressively and dishonestly marketed and sold the 2.0 franchises." *Id.*

First, in examining the franchise disclosure documents from 2018 and 2020, the district court noted that Fetch! had removed all distinctions between the "1.0" and "2.0" franchisees' operations and financial performance representations.[6]  This removal coincided with Fetch!'s acquisition in 2020 by Longe, who claimed ignorance when questioned about this change in the disclosure documents.  Second, in examining two promotional videos for potential franchisees in which Longe touted that purchasing a franchise was a very profitable business and excitedly discussed franchisees' ability to generate $900,000 in gross sales annually, the court deemed this as aggressive recruiting.[7]  Lastly, the court concluded that because there was clear evidence that

---

[5]Because of the many substantial questions that remained concerning the accuracy of and basis for the relevant disclosures, the district court did not decide whether Fetch! substantively violated any franchise disclosure requirement.  It ultimately found that this issue was best left for arbitration.

[6]Fetch!'s 2018 Franchise Disclosure Document, Item 19, which covers its financial performance representations, includes a sub-section titled "Comparison Between Fetch! 2.0 and Fetch! 1.0" and offers two side-by-side columns highlighting the differences between the "1.0" and "2.0" models pertaining to initial fees, franchisor assistance, royalty fees, franchisee support fees, and other categories.  In contrast, in Fetch!'s 2023 Franchise Disclosure Document, these differences were removed and replaced with general performance metrics reflecting high maximum gross sales.

[7]Longe tried to downplay the relevance of those statements by saying that he said them to "a consulting group."  DE 42, Prelim. Inj. Evidentiary Hr'g, PageID 6902.  But Fetch!'s own expert explained that franchisors use "consultants" for "[l]ead generation."  DE 44, Prelim. Inj. Evidentiary Hr'g, PageID 7131.  So Longe knew, or at least should have known, that consultants would use the information he provided to recruit potential franchisees.  Indeed, some of the witnesses testified that consultants told them that other Fetch! franchisees "were bringing in a million dollars in total revenue."  DE 42, Prelim. Inj. Evidentiary Hr'g, PageID 7043; *see also* DE 9-4, Wang Declaration, PageID 519.

in "aggressively recruiting 2.0 franchisees while obscuring from them the true and full nature of the business and expected financial performance," Fetch! exhibited unclean hands. *Id.* at 6799.

These findings were further corroborated by consistent and credible testimony from various former franchisees. For example, award-winning "1.0" franchisee Lorrie Culp, who joined Fetch! in 2008, was unaware of the different franchise models until March 2023, when she met fellow legacy franchisee Tamara Bean while on vacation. Prior to then, potential franchisees had been directed to Culp to discuss joining Fetch! and to hear about her experience, likely because her franchise "mean[t] the world to [her]." DE 44, Prelim. Inj. Evidentiary Hr'g, PageID 7306. However, once she discovered the existence of different fee structures, Culp informed Fetch! that she did not "feel comfortable doing [recruiting] anymore." *Id.* at 7304. Culp also testified that since she was nearing retirement age, she had planned to sell her franchise to two of her pet sitters, who had expressed interest in jointly purchasing it. But when they learned that their royalty fees would be 22%, they "did not quite understand how [Culp] had been in business" for so many years and still "made a profit when looking at the numbers." *Id.* at 7305–06.

As it relates to the managed-services franchisees (a subset of the "2.0" franchisees), the district court found Fetch!'s bad faith to be "even more egregious." DE 38, Prelim. Inj. Order, PageID 6799. Although Longe testified that "2.0" defendants could have been successful had they made more of an effort,[8] the managed-services franchisees consistently testified that their model had been marketed to them as a passive-income investment opportunity. *Id.* For example, one managed-services franchisee, Kristen Venetsanos, testified that she received a call from a Fetch! franchise consultant who introduced her to the franchise and mentioned that "there were [Fetch!] locations in [her] area that were bringing in a million dollars in total revenue." DE 42, Prelim. Ing. Evidentiary Hr'g, PageID 7043. This made the idea of joining sound "very appealing" to her because "it was passive income" and she "thought [she] would be able to work [her] full-time job and run this business and grow [it] with the support of the SMC." *Id.* at 7042–

---

[8]Specifically, Longe testified: "[S]ales are always subject to how much effort you put in, that's what you get out." DE 42, Prelim. Inj. Evidentiary Hr'g, PageID 6848. And he explained that having "a successful pet business . . . is *all* encompassing." *Id.* at 6869 (emphasis added).

43.  Prior to buying a franchise, Venetsanos participated in "discovery day," a recruiting event for prospective franchisees to meet selected Fetch! franchisees. *Id.* at 7043.  She recalls that they "[r]eally bought [her] into believing this was a family, that they were going to take care of [her] . . . [and] that [Fetch!] really cared about the people that were going to be coming in." *Id.* at 7044.  Venetsanos was convinced that joining Fetch! "was going to be an amazing opportunity" and ultimately purchased a franchise in May 2021. *Id.* at 7043–44.

However, "[n]early right off the bat[,] there were issues." *Id.* at 7045.  Venetsanos alleges that some of the issues included non-responsiveness from Fetch! regarding open unresolved client tickets, unanswered leads from prospective clients, and neglected internal notes from her to the dedicated support team, which was included in her franchise model.  According to Venetsanos, it reached the point that there were "so many" complaints and with such frequency that it started "impacting [her] actual day job." *Id.* at 7050.  Venetsanos "had to get [her] mom to help" her for free because she "was not making any money." *Id.*  For her, none of Fetch!'s promises turned out to be true.  Notably, Venetsanos also claims not knowing "there was a difference between legacy owners[']" franchise model and what she had purchased.

After taking the matter under advisement, the district court determined that the "2.0" franchisees consistently and credibly testified that they were initially unaware of any differences between Fetch! "1.0" and "2.0," that they were never profitable under the "2.0" model, and that their lack of success effectively forced them out of their agreements.  DE 38, Prelim. Inj. Order, PageID 6799–6800.  Accordingly, the court denied injunctive relief as to the "2.0" defendants, including those under a managed-services model, because it found that there was convincing "evidence of [Fetch!]'s bad faith as an underlying cause of the 2.0 Defendants' allegedly improper conduct at issue here," and determined that the unclean hands doctrine applied. *Id.* at 6800.

The district court's application of unclean hands was within the bounds of its discretion.  And although Fetch!'s actions may not be "punishable as a crime" or justify independent "legal proceedings," they can fairly "be said to transgress equitable standards of conduct." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945).  And this was enough for the court to deny Fetch! equitable relief.  Since unclean hands "closes the doors of a court of

equity to one tainted with inequitableness or bad faith," we may affirm without considering the other preliminary injunction factors.  *Id.* at 814.

ii.        "1.0" Legacy Franchisees

The district court did not reach whether to apply the unclean hands doctrine to Fetch!'s claims against the three "1.0" franchisees—TMB Pet Care, LLC; Under a Woof, LLC; and Worry-Free Pet Services, Inc.  But these franchisees ask us to apply it, and since we "may affirm the district court on any ground supported by the record" *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1014 (6th Cir. 2022), we take that approach.

It is undisputed that these three franchises operated competing businesses in breach of their non-compete agreements.  In fact, the district court found that the record clearly showed that they had continuously managed "largely successful, profitable franchises even throughout the changes instituted by Plaintiff's new ownership."  DE 38, Prelim. Inj. Order, PageID 6801. The court also found sufficient evidence indicating that Fetch! had cut off these legacy franchisees from its system while they were current on their payments and before they had operated any competing business or improperly used Fetch!'s confidential or proprietary information.

To the district court, these franchisees had also consistently and credibly testified that, until Fetch! cut their access, they had no intention of leaving or competing with Fetch!, at least while the dispute in arbitration remained pending.  Although disputed by Longe, the court also found that the "1.0" franchisees consistently testified that downloading information from Fetch! was neither unusual nor improper and that this practice dated back years.[9]  Due to the significant deference we afford the district court, we will not disturb its credibility determinations here.  *See Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 628 (6th Cir. 2000) (affirming a district court's denial of a preliminary injunction when, "[u]pon review of the record, [it] c[ould not] say that the district court's findings or credibility assessments [were] clearly erroneous.").

---

[9]While the district court noted the existence of a transition letter in the record, it also noted the letter's disclaimer advising franchisees that they could send it *if* they were forced to leave the Fetch! system.

Importantly, the district court found "sufficient evidence at this stage that [Fetch!] committed the first material/substantial breach by cutting off the legacy Defendants' access to the Fetch! system before these Defendants ever operated competing businesses or improperly used Plaintiff's confidential and/or proprietary information." DE 38, Prelim. Inj. Order, PageID 6801. That finding was based largely on the court's assessment of the "1.0" franchisees' credibility. *See id.* at 6802–03. And because we give "singular deference to a trial court's judgments about the credibility of witnesses," we see no basis to disturb that finding on appeal. *Cooper v. Harris*, 581 U.S. 285, 309 (2017).

Lastly, because TMB Pet Care, Under a Woof, and Worry-Free Pet Services are respectively organized under the laws of Washington, Illinois, and Iowa, those states' franchise laws conferred certain protections on them. So even if Fetch! had "good cause" to terminate the legacy franchisees, by failing to provide them with written notices and depriving them of a reasonable period to cure any default,[10] Fetch! likely violated these states' franchise laws. *See* Wash. Rev. Code § 19.100.180(2)(j); 815 Ill. Comp. Stat. 705/19(b); Iowa Code § 537A.10(7)(a)–(b).

Therefore, based on the district court's factual findings on this preliminary record, Fetch!'s decision to cut the 1.0 franchisees off from its system "transgress[ed] equitable standards of conduct" and thus constituted "sufficient cause for the invocation" of the unclean hands doctrine. *Precision Instrument*, 324 U.S. at 815. "In determining whether a party comes before this Court with clean hands, the primary factor to be considered is whether the party sought to mislead or deceive the other party." *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 344 (6th Cir. 2018) (citation modified). After all, "he who comes into equity must come with clean hands." *Precision Instrument*, 324 U.S. at 814. We thus affirm the district court's partial denial of a preliminary injunction as it relates to the 1.0 franchisees. However, we do so because of Fetch's unclean hands, and not (as the district court did) because of the first-material-breach defense.

---

[10]Specifically, the aforementioned states stipulate that this period should be at least thirty days. *See* Wash. Rev. Code § 19.100.180(2)(j); 815 Ill. Comp. Stat. 705/19(b); Iowa Code § 537A.10(7)(a)–(b).

**B.  Irreparable Harm**

Since we "may affirm the district court on any ground supported by the record," *Bannister*, 49 F.4th at 1014, we focused on the equitable doctrine of unclean hands here and largely avoided discussing the district court's balancing of the preliminary injunction factors from *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008).  Nevertheless, we note that because we disagree with the district court's analysis of the "irreparable injury" factor, we seek to clarify our existing precedent.

First, the district court mistook our decision in *Performance Unlimited* as requiring a heightened showing of irreparable harm when a movant seeks a preliminary injunction on claims that shall "be resolved in a pending arbitration[.]"  DE 38, Prelim. Inj. Order, PageID 6815.  Specifically, the district court held that "a preliminary injunction is only warranted where the injury is of such significance that it threatens the entirety of a plaintiff's business." *Id.*  But we held in *Performance Unlimited* that the same "four criteria" apply in this context as they would in any other preliminary injunctive request.  52 F.3d at 1380.

Second, the district court erred by applying a clear-and-convincing standard to show irreparable harm.  The court adopted this standard from one of our decades-old, unpublished opinions, *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002).  And *Patio Enclosures* adopted the standard from an Ohio Court of Appeals case: *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 340 (Ohio Ct. App. 1997).  Indeed, various district courts throughout our circuit have cited *Patio Enclosures* to apply this heightened clear-and-convincing standard.  *See, e.g.*, *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 583 (W.D. Mich. 2025); *CPM Acquisition Corp. v. Easterday*, 2024 WL 3648076, at *8 (W.D. Mich. Aug. 5, 2024); *ABO Staffing Servs., Inc. v. UnitedHealthcare Ins. Co.*, 2022 WL 3335797, at *5 (E.D. Mich. Aug. 12, 2022); *Whitworth v. CoreCivic, Inc.*, 2018 WL 3872198, at *7 (M.D. Tenn. Aug. 15, 2018), *report and recommendation adopted*, 2018 WL 4333980 (M.D. Tenn. Sept. 11, 2018); *Monroe Fed. Sav. & Loan Ass'n v. NEA Galtier Parking, LLC*, 2012 WL 2847547, at *6 (S.D. Ohio July 11, 2012); *Chandler v. Escobar*, 2010 WL 3729813, at *3 (N.D. Ohio Aug. 20, 2010), *report and recommendation adopted*, 2010 WL 3729810 (N.D. Ohio Sept. 7, 2010).  The clear-and-convincing standard imposes a higher burden

than the federal standard, which requires that a movant show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original); *see, e.g.*, *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 49 (2025). Accordingly, district courts in our circuit should adhere to the federal standard.

Lastly, the district court erred by holding that Fetch!'s harms were either in the past or too speculative. Our precedent has consistently held that competitive injuries like those alleged here qualify as irreparable harm precisely because they are "difficult to calculate." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550; *see also Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Hence, the "speculative" nature of Fetch!'s harms is precisely what makes them irreparable. *Cf.* DE 38, Prelim. Inj. Order, PageID 6812–15. And because it is "impossible to know" just how much the loss of goodwill and unfair competition will cost Fetch!, its injury is thus irreparable. *Hall*, 878 F.3d at 530.

**IV.**

Because we are "mindful that a preliminary injunction is an 'extraordinary' form of relief," *Serv. Emps. Int'l Union Loc. 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (quoting *Overstreet*, 305 F.3d at 573), we affirm.